# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |
| PROSPECT CCMC, LLC, *et al.*,[2] | |
| Plaintiffs, | |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services; and MEHMET OZ, in his official capacity as Administrator, Centers For Medicare and Medicaid Services, | Adv. Proc. No. 25-08009 (SGJ) |
| Defendants. | |

**REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

[2] The Plaintiffs in this adversary proceeding are Prospect Penn, LLC; Prospect Crozer, LLC; Prospect CCMC, LLC; Prospect DCMH, LLC; Prospect Crozer Urgent Care, LLC; Prospect Penn Health Club, LLC; Prospect Crozer Home Health and Hospice, LLC; Prospect Crozer Ambulatory Surgery, LLC; Prospect Health Services PA, Inc.; and Prospect Provider Group PA, LLC.

1. Despite their colorful characterizations of CMS' actions, Plaintiffs cannot avoid one critical, undisputed fact: CMS terminated CCMC's Medicare provider agreement ***because CCMC stopped providing inpatient services as of May 2, 2025, and was no longer a "hospital" eligible to participate in the Medicare program***. Plaintiffs also gloss over the rather important detail that once CCMC stopped providing inpatient services, they could not, ***by law***, use CCMC's hospital provider number to bill Medicare for services provided by their outpatient Pennsylvania ASC/Imaging Sites. Although Plaintiffs imply that these facilities are provider-based hospital outpatient departments (HOPDs) entitled to use CCMC's hospital provider number, they carefully avoid alleging that CMS actually approved the Pennsylvania ASC/Imaging Sites as qualified HOPDs pursuant to federal regulations.[3]

2. Moreover, outpatient facilities seeking provider-based status must meet certain criteria required under the Medicare regulations, including but not limited to: (1) patients at the facility must have "full access to all services of the ***main provider***"; (2) staff at the facility must have "clinical privileges ***at the main provider***"; and (3) the ***main provider*** must "maintain[] the same monitoring and oversight" of the outpatient facility. 42 C.F.R. § 413.65(d)(2)(i), (ii), (vi) (emphasis added). Plaintiffs satisfy none of these regulatory requirements as the main provider, CCMC, ceased operations. Plaintiffs also conveniently fail to disclose that the closure of CCMC did not leave the outpatient Pennsylvania ASC/Imaging Sites without access to Medicare reimbursements. At any time, including before and during CCMC's closure process, Plaintiffs

---

[3] *See* Compl. at ¶¶ 19-20; Motion, fn. 4; 42 C.F.R. § 413.65(d) ("Any facility or organization for which provider-based status is sought . . . must meet all of the following requirements ***to be determined by CMS*** to have provider-based status[.]") (emphasis added); 42 C.F.R. § 413.65(b)(1) ("A facility or organization is not entitled to be treated as provider-based simply because it or the main provider believe[s] it is provider-based."). Here, there has been no determination by CMS that the Pennsylvania ASC/Imaging Sites are provider-based entities.

could apply to CMS under applicable Medicare law to have their outpatient facilities qualify as free-standing ambulatory surgical centers (ASCs) or independent diagnostic testing facilities (IDTFs) entitled to their own Medicare provider number and billing privileges, albeit at a lower reimbursement rate than CCMC's hospital rate.[4]

3.     But Plaintiffs chose forgiveness rather than to seek permission and continued using CCMC's hospital provider number to bill CMS as if they were HOPDs despite there being no access for their patients to a "main provider" hospital. This self-inflicted billing predicament can only be resolved by the administrative process. Hoping to find a quick remedy under the guise of alleged discrimination and stay violations, however, Plaintiffs want this Court to declare CMS "may not refuse to accept and process Medicare Reimbursements after the Petition Date." Compl. at ¶ 50. This relief can only be accomplished by reinstating CCMC's Medicare enrollment and forcing CMS to retroactively determine the Pennsylvania ASC/Imaging Sites are provider-based HOPDs.

4.     Such extraordinary relief is not only outside the jurisdiction of this Court but would unjustly reward Plaintiffs' non-compliance with Medicare regulations and failure to seek Medicare privileges for their offsite facilities. Indeed, Plaintiffs' entire case is based on the flawed premise that CMS' termination of CCMC's Medicare provider agreement is the (alleged discriminatory) action that prevents them from receiving Medicare reimbursements. The Termination Notice, however, simply notified Plaintiffs of CCMC's legal status that it was no

---

[4] To qualify as an ASC, an entity "***must have an agreement with CMS to participate in Medicare as an ASC, and must meet the conditions set forth [in the Medicare regulations]***." 42 C.F.R. § 416.2 (emphasis added). No such agreement exists here. To qualify as an IDTF, an entity "must certify in its enrollment application that it meets" a list of standards and related requirements. *See* 42 C.F.R. § 410.33(g)(1)-(17). No such application has been submitted to CMS. Accordingly, by operation of the law, the Pennsylvania ASC/Imaging Sites are neither ASCs nor IDTFs.

3

longer eligible to participate in Medicare as a hospital, which, by law, also includes any outpatient facilities billing under the hospital's provider number. Therefore, the only definitive "action" precluding Plaintiffs' outpatient facilities from being reimbursed as HOPDs is the closure of their in-patient hospital facility, ***not*** the form letter notifying CCMC of its obvious ineligibility to continue using its hospital provider number once it was no longer operating as a hospital.

5. The facts as recited by Plaintiffs clearly demonstrate that any alleged harm could only be caused by what "they believe" Medicare should allow them to do (*i.e.*, use CCMC's hospital provider number instead of acquiring Medicare privileges for their outpatient facilities) rather than the controlling regulations or any action taken by CMS.[5] Plaintiffs' grievances regarding their entitlement to Medicare benefits, therefore, must be channeled through the administrative process before judicial review can occur, leaving this Court no option but to dismiss the Complaint for lack of jurisdiction, as well as for a failure to allege facts or claims upon which relief can be granted.

**I.    The Complaint Is Subject to the Medicare Act's Jurisdictional Scheme and *Benjamin*.**

6. Notably, Plaintiffs do not address *Benjamin*, the controlling Fifth Circuit precedent addressing the Medicare statute's channeling provisions, and instead shift focus by relying on cases from other jurisdictions that are materially distinguishable. Plaintiffs predominantly rely on *University Medical Center* ("*UMC*"), 973 F.2d 1065, 1072 (3d Cir. 1992), wherein CMS withheld approved Medicare payments admittedly owed to the provider. The court found that it had jurisdiction because the parties stipulated all Medicare-related issues, including amounts owed, so

---

[5] *See* Opp. at ¶ 14. By conceding that they only "believe" to have "valid claims" for Medicare reimbursements, Plaintiffs tacitly acknowledge that their decision to bill the outpatient facilities under CCMC's hospital provider number may not be permissible under Medicare law.

4

the only issue before the court was whether CMS' withholding of the agreed-upon Medicare reimbursements violated the automatic stay. *Id.* at 1073.

7. Citing to *UMC*, however, does not change the true nature or purpose of the Complaint: Plaintiffs demand this Court declare that "Defendants may not terminate CCMC's Medicare enrollment or refuse to accept and process Medicare Reimbursements[.]". Compl. at ¶ 50. Plaintiffs also concede that the damages they seek will "recompense for past and ongoing harm and will be in an amount proven at trial." Opp. ¶ 41. Termination of a Medicare provider agreement nor calculation of amounts owed were at issue in *UMC*.

8. Plaintiffs continue to argue that "administrative exhaustion does not apply given that the bankruptcy court has independent jurisdiction to adjudicate alleged violations of the Bankruptcy Code." Opp. at ¶ 19 (citing to *UMC*). The *UMC* court found that it had jurisdiction, though, because "***there is no system of administrative review in place to address the issues raised by UMC in its adversary proceeding***." 973 F.2d at 1073 (emphasis added). However, whether the Pennsylvania ASC/Imaging Sites qualified as HOPDs once the main provider closed as of May 2, 2025, is not only an issue that must first be decided by CMS, *see* fn. 3, but Plaintiffs are simultaneously pursuing their requested relief through the established administrative process. Thus, Plaintiffs here have an alternative path for relief available to them.

9. Plaintiffs' reliance on *In re THG Holdings LLC*, 604 B.R. 154 (Bankr. D. Del. 2019), is equally inapposite and unpersuasive. The plaintiffs in *THG* never sought declaratory relief that CMS could not terminate a provider agreement or refuse to process or accept Medicare payments. Unlike *THG* or *UMC*, CMS here is not withholding any approved post-petition Medicare payments owed to the Plaintiffs. CMS has paid *all* claims submitted by CCMC in the

5

ordinary course, including claims submitted after May 2, 2025. *See* Compl. at ¶ 41 (admitting that no claims were allegedly submitted after June 3, 2025, and making no allegations that there are any amounts currently being withheld by CMS).

10. A declaration that CMS may not terminate (or improperly terminated) CCMC's Medicare provider agreement is a request "arising under" the Medicare statute that requires this Court to interpret and adjudicate Medicare law. Further, any alleged "damages" or harm described under Counts II and III are completely dependent on "[w]hether CMS's decision to terminate CCMC's enrollment status was proper under the Medicare Act." Opp. at ¶ 16. Therefore, Plaintiffs' assertion that the Complaint raises only bankruptcy issues is an unsuccessful attempt to equip this Court jurisdiction to circumvent the jurisdictional bar included in the Medicare statute. *See In re Benjamin*, 932 F.3d 293, 295 (5th Cir. 2019) ("Under 42 U.S.C. § 405(h), federal courts' ability to hear claims arising under the [Medicare statute] is largely curtailed[.]").

## II. Defendants Have Not Waived Sovereign Immunity.

11. Plaintiffs attempt to invoke § 105(a) as support entitling them to a declaration that Medicare reimbursements constitute property of the estate, but do not ask the Court to enforce any specific provision of the Bankruptcy Code other than § 541. First, sovereign immunity bars any claims under § 541. *See* 11 U.S.C. § 106(a)(1). Second, Plaintiffs cannot use § 105(a) as an independent basis for declaratory relief.[6] *See In re Thornhill Bros. Fitness, L.L.C.*, 85 F.4th 321, 327 (5th Cir. 2023) ("A bankruptcy court's decisions and orders must rest on ***specific authorization from Title 11***, not general efficacy or technocratic desirability, because § 105 does not convey roving commission to do equity.") (emphasis added).

---

[6] Plaintiffs ignore that they asked this Court to declare that Plaintiffs' right to submit claims and receive Medicare Reimbursements is property of the estates ***under 11 U.S.C. § 541(a)***." Compl. ¶ 50 (emphasis added).

### III. Medicare Reimbursements Are Not Property of the Estate.

12.     Plaintiffs' reliance on the *THG Holdings* bankruptcy case for the sweeping proposition that Medicare payments constitute property of the estate, *see* Opp. at ¶ 26, is not only taken out of context but also contrary to controlling precedent. A bankruptcy estate "cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Product Holdings, Inc. v. Tempnology, LLC,* 587 U.S. 370, 381 (2019). As the Fifth Circuit has already determined, outside of bankruptcy, health care providers such as CCMC "do not have a property interest in continued participation or reimbursement" because they are not "the intended beneficiaries of the federal health care programs." *Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019). Because Plaintiffs do not have a cognizable property interest in participating in Medicare, their alleged "Medicare Reimbursements" cannot constitute property of CCMC's bankruptcy estate.

### IV. Plaintiffs Cannot Use 11 U.S.C. § 362 to Liquidate Disputed Claims.

13.     Recognizing that they cannot ask this Court to resolve disputed Medicare claims under section 362 of the Bankruptcy Code, Plaintiffs introduce a new section of the Bankruptcy Code that is entirely absent from the Complaint—section 542—but they cannot amend their Complaint through their Opposition. Opp. at ¶ 29. *See Calvary Chapel of Bangor v. Mills*, 542 F. Supp. 3d 24, 37 (D. Me. 2021), *aff'd*, 52 F.4th 40 (1st Cir. 2022) ("[A] party cannot amend its Complaint by assertions made in briefs."); *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105 (D.D.C. 2018) (same).

### V. Issuing the Termination Notice Was an Exercise of CMS' Regulatory Power Excepted From the Automatic Stay.

14.     Plaintiffs also rely on non-controlling caselaw to try and persuade the Court that CMS' exercise of its regulatory power to notify CCMC of its ineligibility to participate in the

Medicare program is not excepted from the automatic stay under § 362(b)(4). Opp. at ¶ 32. Plaintiffs, however, fail to address *In re FiberTower Network Servs. Corp.*, where this Court interpreted § 362(b)(4) broadly and explicitly held that government agencies qualify for the police and regulatory exception when their actions are "primarily intended to bring entities into compliance with applicable regulations[.]" 482 B.R. 169, 180 (Bankr. N.D. Tex. 2012). As evidenced by the Termination Notice, CMS did exactly what this Court in *FiberTower* ruled it could do: bring CCMC in compliance with Medicare law and undoubtedly "affect[] matters of public health, safety, or welfare" by ensuring, among other things, that offsite facilities either maintain a "main provider" facility or are otherwise properly vetted and approved by CMS. *Id.*

### VI. Medicare Recoupment Is Not Subject to the Automatic Stay in the Fifth Circuit.

15. Plaintiffs argue that CMS should not be allowed to recoup because CMS had "unclean hands" in dealing with Plaintiffs during "settlement" negotiations. Opp. at ¶ 40. CMS cannot be penalized for voluntarily engaging in good faith discussions, nor faulted for Plaintiffs' unjustifiable "reliance upon" alleged statements that CMS would unequivocally reimburse CCMC notwithstanding the Plaintiffs' failure to secure billing privileges for the Pennsylvania ASC/Imaging Sites. *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60-63 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant . . . . [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."). CMS cannot be stripped of its recoupment rights simply because the parties' discussions ultimately proved to be unfruitful. The black letter law remains that "Medicare recoupments are not subject to an automatic stay in bankruptcy." *Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 530 (5th Cir. 2020).

## VII. Plaintiffs Are Barred From Recovering Damages Under 11 U.S.C. § 362(k).

16.     Plaintiffs attempt to confuse the Court by stating that Defendants conceded that "the caselaw is mixed" on whether corporate debtors, as opposed to individual debtors, are entitled to damages under section 362(k) for willful violations of the automatic stay. Opp. at ¶ 42. Plaintiffs fail to clarify that the caselaw is mixed on the issue ***only among courts outside of the Fifth Circuit***. Courts in the Fifth Circuit – including this Court – consistently hold that corporate debtors such as Plaintiffs cannot recover damages under § 362(k).[7] Plaintiffs attempt to move away from § 362(k) by now asking for "discretionary damages under Section 105(a) for violations of the automatic stay." Opp. at ¶ 43. Plaintiffs cannot use § 105(a) to circumvent controlling law, which precludes the award of § 362(k) damages. *See In re Thornhill*, 85 F.4th at 327 (a debtor "cannot rely on '§ 105 where more specific provisions of Title 11 could be read as controlling.'") (quoting *Radlax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–47 (2012)).

## VIII. By Their Own Admission, Plaintiffs Cannot Show CMS Violated 11 U.S.C. § 525(a).

17.     CMS' purported discriminatory intent to reimburse Plaintiffs' offsite facilities as approved HOPDs only if Plaintiffs satisfied "prepetition debts," Opp. at ¶ 47, is wholly unsupported by the alleged facts. First, CMS disagrees with Plaintiffs' mischaracterization of their "settlement" discussions and any allegation that CMS demanded repayment of prepetition debts in exchange for access to the Medicare program. Second, even accepting Plaintiffs' allegations as true for purposes of the Motion, Plaintiffs cannot prevail because they cannot allege any facts

---

[7] *See In re MD Promenade, Inc.*, 2009 WL 80203, at *12 (Bankr. N.D. Tex. Jan. 8, 2009) ("It is well settled that a corporation is not entitled to recover damages for violation of the automatic stay."); *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) (same); *In re Tusa-Expo Holdings, Inc.*, 2014 WL 172276, at *4 (Bankr. N.D. Tex. Jan. 15, 2014) (same); *In re Roxwell Performance Drilling, LLC*, 2014 WL 2800767, at *4 (Bankr. N.D. Tex. June 19, 2014) (same); *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 268 (Bankr. N.D. Tex. 2002) (same); *In re First RepublicBank Corp.*, 113 B.R. 277, 279 (Bankr. N.D. Tex. 1989) (same).

indicating that the bankruptcy filing was CMS' "sole reason" for terminating CCMC's Medicare enrollment agreement. *Devon Enters., L.L.C. v. Arlington Indep. Sch. Dist.*, 541 F. App'x 439, 442 (5th Cir. 2013).

18. Again, Plaintiffs avoid the undisputed fact precipitating CCMC's Medicare enrollment termination. CMS terminated the provider agreement because, "[CCMC] was no longer providing care to inpatients and had discharged its last inpatient on May 2, 2025. ***Based on these findings***, CMS determined CCMC was no longer operating as a hospital because the facility ceased providing inpatient services on May 2, 2025." Termination Notice, Exhibit "C" to Motion to Dismiss (emphasis added). Plaintiffs' assertion that unsuccessful discussions between the parties and CMS' alleged demands for prepetition payments prove CMS' discriminatory motive is irrefutably belied by CCMC's closure. There are no facts or allegations supporting a claim that CMS terminated CCMC's Medicare enrollment "***solely because***" of CCMC's Chapter 11 case.

Dated: September 23, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Jae Won Ha*
KIRK T. MANHARDT
MARY A. SCHMERGEL
JAE WON HA
United States Department of Justice
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-5383
E-mail: jae.won.ha@usdoj.gov

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

      I certify that on September 23, 2025, a true and correct copy of the foregoing was served via electronic means through transmission facilities from the Court upon those parties authorized to participate and access the Electronic Filing System in the above-captioned case.

Dated: September 23, 2025      */s/ Jae Won Ha*
                                                                  JAE WON HA