

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 18, 2025**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **PROSPECT MEDICAL HOLDINGS, INC.**, *et al.*, | § | **Case No. 25-80002-sgj-11** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |
| | § | |
| **PROSPECT CCMC, LLC**, *et al.*, | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| v. | § | **Adv. Pro. No. 25-8009-sgj** |
| | § | |
| **ROBERT F. KENNEDY, JR.**, in his official capacity | § | |
| as Secretary, United States Department of Health and | § | |
| Human Services; and **MEHMET OZ**, in his official | § | |
| capacity as Administrator, Centers for Medicare and | § | |
| Medicaid Services, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS: (A) COUNT I OF THE COMPLAINT, PURSUANT TO RULE 12(b)(1), FOR LACK OF SUBJECT MATTER JURISDICTION; AND (B) COUNTS II AND III OF THE COMPLAINT, PURSUANT TO RULE 12(b)(6), FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

## I.    Introduction

This adversary proceeding ("Adversary Proceeding") involves a Pennsylvania hospital (one of several owned by the above-referenced Chapter 11 debtors) that was closed five months postpetition and certain actions taken by the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") shortly after that closure.

The Adversary Proceeding was brought by certain debtors in these jointly administered chapter 11 bankruptcy cases (collectively, "Plaintiffs" or the "Crozer Debtors"). The closed Pennsylvania hospital that is the subject of this Adversary Proceeding is sometimes referred to as CCMC, formerly known as Crozer Chester Medical Center, and it was owned by the Crozer Debtor known as Prospect CCMC, LLC ("CCMC"). The Crozer Debtors are a subset of Prospect Medical Holdings, Inc., the lead Debtor, and its hospital-related debtor affiliates (the "HCo Debtors"), PHP Holdings, LLC ("PHPH"), and the physician-related debtor affiliates (together with PHPH, the "PCo Debtors"). All are debtors-in-possession in the above-captioned chapter 11 cases (collectively, "Prospect," or the "Debtors").[1] The HCo Debtors filed bankruptcy on January 11, 2025 (the "HCo Petition Date"). The PCo Debtors filed bankruptcy on July 7, 2025 (the "PCo Petition Date").

Now before the court is a Rule 12(b) motion to dismiss the Adversary Proceeding filed by the United States, on behalf of defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS, and Mehmet Oz, in his official capacity as Administrator of CMS ("Defendants").

---

[1] The court recently confirmed a chapter 11 plan, but it has not yet gone effective.

In the governing complaint in this Adversary Proceeding ("Complaint"), the Debtors seek a declaratory judgment that Defendants' postpetition termination of the Medicare enrollment eligibility for CCMC and nonpayment of Medicare Reimbursements for services that were provided by the Debtors at nearby inpatient facilities for a few weeks after closure of CCMC were violations of the automatic stay and not excepted exercises of Defendants' police or regulatory power. The Crozer Debtors also seek monetary damages from the Defendants for their alleged willful violation of the automatic stay, and also for Defendants' alleged discrimination against the Crozer Debtors, based solely on their status as debtors in bankruptcy in violation of Bankruptcy Code § 525(a).

Some elaboration is in order. Prior to CCMC's closure, the Crozer Debtors had been participating in the Medicare Program[2] and billed CMS for reimbursable services rendered at the hospital through the unique provider number assigned to CCMC. Importantly, the Crozer Debtors had also been operating three ambulatory surgery centers and two imaging sites ("Pennsylvania ACS/Imaging Sites") in the same community as CCMC and had always billed CMS for services rendered at those sites as hospital outpatient departments ("HOPDs") of CCMC, using the same CCMC hospital provider number. CCMC was closed and ceased operations on May 1, 2025, after months of attempted but unsuccessful sale efforts. After May 1, 2025, the Debtors continued providing services at the Pennsylvania ACS/Imaging Sites "to minimize disruption to patient care and the surrounding communities," pending an anticipated future sale of those ancillary sites. The Crozer Debtors allege that, beginning in late May, they engaged in discussions with CMS regarding

---

[2] The commonly known "Medicare Program" is a federally funded program of health insurance for the aged and disabled. 42 U.S.C. § 1395, *et seq.*, (the "Medicare Act"). Congress has charged the Secretary of HHS with the responsibility for administering the Medicare Program and has authorized the Secretary to issue regulations and interpretive rules implementing the statute. *See, e.g.*, 42 U.S.C. §§ 405(a), 1395hh(a), and 1395ii. The Secretary has delegated these responsibilities to CMS. *See* 55 Fed. Reg. 9363 (March 13, 1990) and 66 Fed. Reg. 35437-03 (July 5, 2001).

(i) CCMC's voluntary post-closure termination of its Medicare enrollment, and (ii) the ability of the Pennsylvania ACS/Imaging Sites to continue to bill and submit a portion of fee-for-service payments for Medicare/Medicaid reimbursement pending the sale of those sites. Plaintiffs allege that, following these discussions, ***Plaintiffs voluntarily placed a hold, effective as of June 3, 2025, on new Medicare/Medicaid claims for services that had been furnished after May 1, 2025 at the Pennsylvania ASC/Imaging Sites***; in other words, Plaintiffs did not seek from CMS reimbursement for such claims ("Medicare Reimbursements"). To be clear, CMS is not alleged to have withheld Medicare Reimbursements for ***any*** postpetition service rendered at CCMC or the Pennsylvania ASC/Imaging Sites ***on or before CCMC's closure on May 1, 2025***, for which Plaintiffs have submitted a claim. However, Plaintiffs believe that it is significant that the Crozer Debtors owe CMS over $8,000,000 in prepetition liabilities ("CMS Prepetition Obligations"), relating to certain advance payments that they received from CMS pertaining to the COVID-19 pandemic and certain cost reports for individual claims, and that these CMS Prepetition Obligations, and CMS's recovery of some amount for them, was discussed as part of the parties' negotiations. Plaintiffs allege that Defendants willfully violated the automatic stay and discriminated against them in violation of Bankruptcy Code § 525, when CMS sent the Crozer Debtors a notice of termination ("Termination Notice") on June 6, 2025, informing them that CMS had determined that, because CCMC had closed and ceased providing ***inpatient*** services as of May 2, 2025, and pursuant to Medicare regulations, CCMC's Medicare provider agreement was being involuntarily terminated effective June 21, 2025, which was 15 days after the date of the Termination Notice. Plaintiffs allege that CMS also willfully violated the automatic stay and discriminated against them by informing Plaintiffs, during their discussions, that CMS would view claims for services furnished after May 1, 2025, as potentially false or fraudulent, notwithstanding

that Plaintiffs had already voluntarily placed a hold on submitting claims for such services, pending their discussions.

## II.    Further Factual and Procedural Background

It was in July 2016 that certain of the Crozer Debtors acquired Crozer Health, which consisted of four general acute care hospitals, several outpatient facilities, and a comprehensive physician network of primary care and specialty practices. As noted, among the outpatient facilities were the Pennsylvania ASC/Imaging Sites that were operated and billed as HOPDs of CCMC—the main hospital facility that provided inpatient services—under CCMC's Medicare provider agreement and CMS Certification Number (the "CCMC Medicare Enrollment").

The Crozer Debtors continued to operate CCMC and the Pennsylvania ASC/Imaging Sites postpetition while they attempted to find a buyer for the Pennsylvania hospitals. Ultimately, the Crozer Debtors' sale efforts were unsuccessful, and the Pennsylvania hospitals, including CCMC, were closed. CCMC ceased providing inpatient services and closed its emergency department as of May 2, 2025, ***but, as earlier noted, the Crozer Debtors continued to operate the affiliated Pennsylvania ASC/Imaging Sites from and after May 2, 2025, through the date of the sale of the Pennsylvania ASC/Imaging Sites at the end of July 2025, at which point operations were handed over to the purchaser of the sites***.

The following timeline regarding CCMC's postpetition closure, the later sale of the Pennsylvania ASC/Imaging Sites, and the Crozer Debtors' interactions with Defendants is relevant to the Defendants' Motion to Dismiss.

**January 11, 2025**: The "Petition Date" – each of the HCo Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[3]

---

[3] As noted earlier, the PCo Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 7, 2025.

**March 6, 2025**: The court held a status conference regarding the potential closure of their Pennsylvania hospitals during which the court heard reports that the Debtors were planning to comply with the regulatory requirements in closing the hospitals. Following the status conference, the Debtors filed their *Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals; and (II) Granting Related Relief* ("Closure Motion") wherein they presented a "Timeline of Closure," which provided that the "Proposed Closure Date" for each hospital would occur "[u]pon completion of emergency department closure" and anticipated that, on the closure date, the Debtors would "[s]ubmit [an] Application to [Medicare Administrative Contractor] ***to voluntarily terminate Medicare enrollment***" for CCMC.[4]

**April 23, 2025**: Entry of order approving the closure of the Pennsylvania hospitals ("Closure Order").[5]

**May 1, 2025**: The patient care ombudsman appointed in these cases confirmed that the "service line" for inpatient and emergency department services at CCMC "officially closed at 7:00 a.m. (prevailing Eastern Time) on May 1, 2025."

**May 2, 2025**: CCMC ceased providing any inpatient services "as of May 2, 2025."[6] However, Debtors did not voluntarily terminate CCMC's Medicare enrollment upon closure of the hospital and continued operating their Pennsylvania ASC/Imaging Sites.

---

[4] DE # 882, ¶ 32 (emphasis added).

[5] DE # 1613.

[6] Complaint, ¶ 21. CMS also notes that, at least as late as July 30, 2025, the front page of CCMC's own website directly led to the following statement:

> ***As of April 30th, 2025, our hospital's emergency room will no longer be seeing new patients. In addition, our physician offices will be closed to all patient visits after close of business on Friday, May 2nd, 2025.***

*See* Motion to Dismiss Brief, ¶ 12. CCMC remains permanently closed.

**May 2 – end of July, 2025**: Debtors continued to operate the Pennsylvania ASC/Imaging Sites after CCMC was closed through the consummation of the sale of the Pennsylvania ASC/Imaging Sites at the end of July.

**May 2-June 3, 2025**: Debtors, for a month after closure of CCMC, continued to bill CMS for services provided at the Pennsylvania ASC/Imaging Sites as "provider-based" hospital outpatient departments using CCMC's unique Medicare provider number.

**May 29, 2025**: Debtors allege that they engaged CMS on this date[7] and "discussed the possibility of CMS continuing CCMC's Medicare enrollment and treating the Pennsylvania ASC/Imaging Sites as though they were free-standing ambulatory surgery centers and independent diagnostic testing facilities, thereby permitting these facilities to bill and collect (i) from the Medicare program under the ASC fee schedule for the surgical procedures performed at the ASCs and (ii) the Medicare physician fee schedule for the imaging services performed at the Imaging Sites."[8]

**June 3, 2025**: Plaintiffs state that, they, on their own initiative,[9] "placed a hold, effective as of June 3, 2025, on new Medicare and Medicaid claims for services furnished after May 1, 2025 at the Pennsylvania ASC/Imaging Sites."

**June 6, 2025**: CCMC received a Termination Notice from CMS, stating that "[n]otwithstanding CCMC's representation that it would voluntarily terminate its Medicare

---

[7] The court gleans from the pleadings that this is the first time, after closure of the CCMC main hospital on May 2, 2025, that the Debtors reached out to CMS regarding this issue, since Debtors represented that "CCMC has been in discussions with CMS since May 29, 2025, regarding (i) a mutually agreeable Medicare enrollment termination date for the Pennsylvania ASC/Imaging Sites (the 'Voluntary Termination') and (ii) a reduction in fee-for-service payments (the 'Payment Reduction') for postpetition services rendered from May 1, 2025 onwards at the Pennsylvania ASC/Imaging Sites." Complaint, ¶ 33.

[8] Complaint, ¶ 34.

[9] Debtors, later in their Complaint, refer to June 3, 2025, as the date "when the Crozer Debtors' voluntary hold on such claims [related to services provided at the Pennsylvania ASC/Imaging Sites post-closure of CCMC] went into effect." Complaint, ¶ 41.

7

enrollment, CMS has determined that CCMC is not in compliance with the applicable Medicare statutory and regulatory provisions" because CMS determined that CCMC was no longer providing inpatient services and, therefore, no longer eligible to participate in Medicare as a "hospital," and that CMS would be terminating CCMC's Medicare provider agreement effective June 21, 2025.[10] The Termination Notice also notified the Crozer Debtors of their right to file an administrative appeal of CMS's determination by requesting a hearing before an administrative law judge (ALJ) of the Department of Health and Human Services, Departmental Appeals Board (DAB) and provided detailed instructions on how to file the appeal electronically.[11] Plaintiffs allege that counsel for CMS informed Plaintiffs "that CMS would consider a Voluntary Termination with an effective date of the earlier of August 1 or the closing date for the sale of the Pennsylvania ASC/Imaging Sites, provided that CCMC also agreed to a Payment Reduction of 38 percent for the ambulatory service centers and 63 percent for the imaging sites."[12]

**July 1, 2025**: After more than a month of what Plaintiffs describe as "continuing settlement discussions" regarding their Voluntary Termination of CCMC's Medicare enrollment and a Payment Reduction (in fee-for-service payments) for postpetition, post-CCMC closure services rendered at the Pennsylvania ASC/Imaging Sites,[13] Plaintiffs allege that CMS informed them that there would be no further settlement discussions and that it was terminating CCMC's Medicare enrollment, effective as of June 21, 2025 (which, the court notes, is consistent with the effective date of the termination set forth in the June 6 Termination Notice). Plaintiffs allege that counsel for CMS told Plaintiffs that "the only possibility of potentially persuading CMS to consider re-

---

[10] *See* Complaint, ¶ 36; Exhibit C, Defendants' Appendix in Support of Motion to Dismiss ("CMS App'x"), 61-64. DE # 9.

[11] Exhibit C, CMS App'x, 62-64.

[12] Complaint, ¶ 35.

[13] *See supra* note 6.

visiting their [termination] decision would be if CCMC entered into a settlement that allows CMS

to recover some or all of that prepetition amount [the CMS Prepetition Obligations]."[14]

**July 7, 2025**: CCMC initiated the first level of administrative appeal by requesting a

hearing before an ALJ of CMS's termination decision.[15] In its appeal, the Debtors argue that the

Pennsylvania ASC/Imaging Sites should qualify as provider-based outpatient departments and the

Debtors should still be able to use CCMC's Medicare provider number to bill for services rendered

at the Pennsylvania ASC/Imaging Sites after the closure of, and cessation of inpatient services at,

CCMC,[16] and, ultimately, that CMS's termination decision effective June 21, 2025 "should be

reversed and CMS should instead accept CCMC's voluntary termination with an effective date of

August 1, 2025."[17]

The Crozer Debtors filed their Complaint on July 11, 2025, setting forth three counts:

- *Count I – Declaratory Judgment* pursuant to 28 U.S.C. §§ 2201 and 2202 that:

  1. the Crozer Debtors' right to submit claims and receive Medicare Reimbursements is property of the estates under 11 U.S.C. § 541(a);

  2. Defendants' termination of CCMC's Medicare enrollment eligibility and associated withholding of Medicare Reimbursements for services that were already provided to Medicare beneficiaries and threats of monetary penalties are

     (i)    an action or proceeding to recover a prepetition claim against the Crozer Debtors, in violation of 11 U.S.C. § 362(a)(1);

     (ii)   an act to obtain possession or control over property of the estates, in violation of 11 U.S.C. § 362(a)(3);

     (iii)  an act to collect, assess or recover a prepetition claim against the Crozer Debtors, in violations of 11 U.S.C. § 362(a)(6);

     (iv)   an attempt to set off against debts that arose prior to the Petition Date, in violation of 11 U.S.C. § 362(a)(7); and

---

[14] Complaint, ¶ 40.

[15] *See* July 7, 2025 Request for Hearing to Departmental Appeals Board, Exhibit D, CMS App'x, 66-74.

[16] *See id.*, CMS App'x, 66-72.

[17] *See id.*, CMS App'x, 72.

> **(v)** not an action or proceeding by a governmental unit to enforce a police or
> regulatory power that is excepted from the automatic stay under 11 U.S.C.
> § 362(b)(4);[18] and,

**3.** Defendants may not terminate CCMC's Medicare enrollment or refuse to accept and
process Medicare Reimbursements after the Petition Date;

- *Count II – Violation of the Automatic Stay*, alleging that Defendants' termination of
CCMC's Medicare enrollment and associated threats of monetary penalties, as well as
Defendants' alleged postpetition demands for payment of prepetition claims, are willful
violations of the automatic stay under Bankruptcy Code § 362, and requesting an award
against Defendants of actual damages, including costs and attorneys' fees, in accordance
with § 362(k) of the Bankruptcy Code; and

- *Count III – Violation of Bankruptcy Code § 525*, alleging that Defendants' termination of
CCMC's Medicare enrollment and threats of monetary penalties are discriminatory acts
taken solely because the Crozer Debtors are debtors under title 11 and requesting an award
of actual damages, including costs and attorneys' fees, in accordance with § 525(a) of the
Bankruptcy Code.

In their prayer for relief, in addition to requesting entry of a declaratory judgment, as set forth in

Count I, and damages relating to Defendants' alleged violations of §§ 362 and 525(a), as set forth

in Counts II and III, the Crozer Debtors request injunctive relief, asking the court to enjoin

Defendants from continuing to violate Bankruptcy Code §§ 362 and 525(a).

On August 19, 2025, the Defendants filed the pending *Defendants' Motion to Dismiss

Plaintiffs' Complaint for Decla[ra]tory and Injunctive Relief* ("Motion to Dismiss").[19] With regard

to Count I (for declaratory relief), Defendants seek dismissal (a) pursuant to Rule 12(b)(1) of the

Federal Rules of Civil Procedure[20] (made applicable herein pursuant to Rule 7012 of the Federal

Rules of Bankruptcy Procedure[21]), for lack of subject matter jurisdiction, because (i) it is barred

---

[18] This second enumerated request for a declaratory judgment can be summarized as a request for a declaration that
(1) CMS's actions here violated the automatic stay imposed by Bankruptcy Code § 362, and (2) they were not excepted
from the operation of the automatic stay under the "police and regulatory powers" exception found in Bankruptcy
Code § 362(b)(4).

[19] DE # 7. Defendants also filed a brief ("Brief") in support and an appendix ("Appendix") of exhibits in support of
their Motion to Dismiss. DE ## 8 and 9, respectively.

[20] Hereinafter, the court shall refer to a rule of the Federal Rules of Civil Procedure as "Rule ___."

[21] Hereinafter, the court shall refer to a rule of the Federal Rules of Bankruptcy Procedure as "Bankruptcy Rule ___."

by sovereign immunity, (ii) Plaintiffs' lack Article III constitutional standing, and (iii) Plaintiffs

have failed to exhaust administrative remedies; and, also (b) pursuant to Rule 12(b)(6), for failure

to state a claim upon which relief can be granted. With regard to Counts II and III, Defendants

seek a dismissal only pursuant to Rule 12(b)(6), for failure to state a claim for either a stay violation

or section 525(a) violation. Plaintiffs filed their response in opposition to the Motion to Dismiss

("Response")[22] on September 9, 2025, and Defendants filed their reply to that Response

("Reply")[23] on September 23, 2025. A hearing ("Hearing") was held on the Motion to Dismiss on

October 9, 2025.[24] Having considered the briefs and the arguments made by counsel at the Hearing,

the court concludes that the Motion to Dismiss must be granted.

## III.   Legal Standards

### A.   Motions to Dismiss

As noted, Defendants seek to dismiss Count I under both Rule 12(b)(1) and (b)(6) and

Counts II and III under Rule 12(b)(6). Under Rule 12(b)(1), a court must dismiss a cause of action

if it determines that it does not have subject matter jurisdiction over the claim. This is because

"[f]ederal courts are courts of limited jurisdiction[,]" and they have the power to adjudicate claims

only when jurisdiction has been conferred on them by statute and the Constitution.[25] Under Article

III of the Constitution, federal courts "may only adjudicate actual, ongoing controversies."[26] "If a

dispute is not a proper case or controversy, the courts have no business deciding it, or expounding

the law in the course of doing so."[27] As noted by the Supreme Court, "the doctrines of

---

[22] DE # 11.

[23] DE # 12.

[24] A transcript of the Hearing ("Hrg. Transcript") was filed at DE # 18.

[25] *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994).

[26] *Shemwell v. City of McKinney, Texas*, 63 F.4th 480, 483 (5th Cir. 2023) (citing *Honig v. Doe*, 484 U.S. 305, 317 (1988)).

[27] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

[constitutional standing,] mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language."[28] If a defendant has sovereign immunity, the cause of action is properly dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.[29] In addition, if Congress has made the exhaustion of administrative remedies a jurisdictional bar to bringing a particular cause of action and the plaintiff has not met its burden of showing that it has exhausted its administrative remedies, the cause of action is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).[30] "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."[31] In considering a Rule 12(b)(1) motion, the court must take the well-pled factual allegations as true and view them in the light most favorable to the plaintiff.[32] "Under Rule 12(b)(1), the court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[33]

Similarly, a plausibility standard is applied in the context of Rule 12(b)(6) motions to dismiss for failure to state a claim.[34] "To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead 'enough facts to state a claim to relief that is

---

[28] *Id.* at 352 (citations omitted).

[29] *See United States v. Miller*, 604 U.S. 518, 527 (2025) ("Sovereign immunity is jurisdictional in nature and deprives courts of the power to hear suits against the United States absent Congress's express consent.") (cleaned up).

[30] *See infra* note 63. The court will discuss the specific application of this doctrine to the causes of action in this Complaint below.

[31] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

[32] *Robledo v. U.S.*, 147 F.4th 515, 519 (5th Cir. 2025) (cleaned up); *see also In re Benjamin*, 932 F.3d 293, 295 (5th Cir. 2019) (quoting *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 500 (5th Cir. 2018)) (at the Rule 12(b)(1) stage, a plaintiff need only "allege a plausible set of facts establishing jurisdiction.").

[33] *Id.*

[34] The "plausibility" standard applies to dismissals under Rule 12(b)(6) for failure to state a claim, as set forth in the Supreme Court cases of *Bell Atl. Corp. v. Twombly*, 550 U. S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)— often referred to as the *Iqbal/Twombly* plausibility standard.

plausible on its face.'"[35]   To meet this standard, a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully."[36] The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff; however, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions."[37] A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[38] In ruling on a Rule 12(b)(6) motion, a court may consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"[39] Second, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'"[40] Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record."[41]

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."[42]   "Moreover, when a complaint could be dismissed for both lack of jurisdiction and failure to state a claim, the court should dismiss only on the jurisdictional ground under Rule

---

[35] *Crutchfield v. Match Grp., Inc.,* 529 F. Supp. 3d 570, 587 (N.D. Tex. 2021) (quoting *Twombly,* 550 U.S. at 570).

[36] *Id.* (quoting *Iqbal*, 556 U.S. at 678).

[37] *Id.* (citing *Ferrer v. Chevron Corp.,* 484 F.3d 776, 780 (5th Cir. 2007)).

[38] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[39] *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

[40] *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).

[41] *Cinel v. Connick,* 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (citations omitted); *see also, e.g., Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand").

[42] *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted).

12(b)(1), without reaching the questions of failure to state a claim under Rule 12(b)(6)"—a "practice [that] prevents courts from issuing advisory opinions."[43] "The practice also prevents courts without jurisdiction 'from prematurely dismissing a case with prejudice.'"[44] In addition, federal courts have an independent "constitutional duty . . . to decline subject matter jurisdiction where it does not exist."[45] Thus, the court will address the Rule 12(b)(1) issues first and, then, to the extent the court finds that it has subject matter jurisdiction over any of the claims asserted by the Plaintiffs, the court will address whether the Plaintiffs have failed to state a claim upon which relief can be granted under Rule 12(b)(6).

### B. Pertinent Statutes and Regulations Regarding the Medicare Program

Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 et seq., commonly known as the "Medicare Act," establishes a federally subsidized health insurance program to be administered by the Secretary of HHS (the "Secretary"),[46] whom Congress has authorized to issue regulations and interpretive rules implementing the statute.[47] The Secretary has delegated these responsibilities to CMS.[48] To receive payment for covered Medicare items or services, a provider must be enrolled in the Medicare program.[49] To enroll, a provider must enter into a provider agreement and meet the requirements of that agreement as part of the process to obtain Medicare billing privileges.[50] To maintain enrollment in the Medicare program, a provider must continue to comply with Title XVIII of the Medicare Act and the applicable Medicare

---

[43] *Crenshaw-Logal v. City of Abilene*, 436 F. App'x 306 (2011) (cleaned up).

[44] *Id.* (quoting *Ramming,* 281 F.3d at 161).

[45] *Abraugh v. Altimus*, 26 F.4th 298, 304 (2022).

[46] *See supra* note 2; *see also Heckler v. Ringer*, 466 U.S. 602, 605 (1984).

[47] *See, e.g.*, 42 U.S.C. §§ 405(a), 1395hh(a), and 1395ii.

[48] *See* 55 Fed. Reg. 9363 (March 13, 1990) and 66 Fed. Reg. 35437-03 (July 5, 2001).

[49] 42 C.F.R. § 424.505.

[50] 42 C.F.R. § 424.510.

regulations.[51] A hospital may request to participate in the Medicare program, but must meet the

conditions of participation, including the statutory definition of a "hospital,"[52] which is defined as

an institution that "is ***primarily engaged in providing . . . inpatient***" services.[53] Hospitals

participating in Medicare are defined as "providers" for Medicare program purposes.[54]

CMS is authorized to terminate a provider agreement when it finds that a provider is out

of compliance with federal requirements.[55] Specifically, the Medicare Act and regulations provide

three avenues for terminating a provider agreement: (i) involuntary termination by CMS;[56] (ii)

involuntary termination by the HHS Office of Inspector General;[57] or (iii) voluntary termination

by the provider.[58] The Secretary may terminate a provider agreement upon reasonable notice to

the provider,[59] and a failure to meet the definition of a "hospital" as defined under section 1395x(e)

of the Medicare Act is one of the specified bases for which CMS may terminate a provider

agreement.[60] An involuntary termination is an "initial determination" that is subject to

administrative appeal rights.[61] If a provider receives an initial determination from CMS—such as

happened with CMS's termination of CCMC's Medicare provider agreement—and is dissatisfied

---

[51] 42 C.F.R. §§ 424.500, 424.516.

[52] 42 C.F.R. §§ 488.3(a), 489.10(a); 42 C.F.R. Part 482.

[53] 42 U.S.C. § 1395x(e) (emphasis added).

[54] 42 U.S.C. § 1395x(u); 42 C.F.R. §§ 400.202 (defining a "provider").

[55] 42 U.S.C. § 1395cc(b)(2); 42 C.F.R. § 489.53.

[56] 42 C.F.R. § 489.53.

[57] 42 C.F.R. § 489.54

[58] 42 C.F.R. § 489.52; s*ee also* 42 U.S.C. § 1395cc(b).

[59] *See* 42 U.S.C. § 1395cc(b)(2) ("The Secretary may refuse to enter into an agreement under this section or, upon such reasonable notice to the provider and the public as may be specified in regulations, may refuse to renew or ***may terminate such an agreement***.") (emphasis added).

[60] *See* 42 U.S.C. § 1395cc(b)(2)(B) (stating CMS can terminate a provider agreement if it "has determined that the provider fails substantially to meet the applicable provisions of section 1395x of this title[.]").

[61] 42 C.F.R. §§ 489.53(e), 498.3(b)(8); 42 U.S.C. § 1395ff(b) (providing administrative appeal rights for "initial determinations").

with CMS's decision, the provider **must first seek administrative review before receiving "judicial**

**review of the Secretary's final decision**."[62]

This administrative review process warrants elaboration here. How is this typically

supposed to work?  One must start with 42 U.S.C. section 405(h), which contains three important

sentences [the bracketed numbering is added by this court]:

> [1] The findings and decision of the Commissioner of Social Security after
> a hearing shall be binding upon all individuals who were parties to such hearing.
> [2] ***No findings of fact or decision of the Commissioner of Social Security shall
> be reviewed by any person, tribunal, or governmental agency except [as provided
> in § 405(g)]***. [3] No action against the United States, the Commissioner of Social
> Security, or any officer or employee thereof shall be brought under section 1331 or
> 1346 of Title 28 to recover on any claim arising under this subchapter.  (Emphasis
> added.)

Note that 28 U.S.C. § 405(h) is made applicable to the Medicare Act by a separate statute:

42 U.S.C. § 1395ii. Note also that 42 U.S.C. section 405(g), which is referenced in the bolded

second sentence of section 405(h) set forth above, provides that judicial review (i.e., review by a

"tribunal") may only be obtained after a claimant receives a "final decision of" the Secretary.

Courts have elaborated regarding 42 U.S.C. section 405(h) as follows: "[c]laims arising

under the Medicare Act must be 'channeled' through the relevant agency (in this case HHS) before

they can be challenged in federal court[,]" which means "the plaintiff must first bring its claims

before the agency and can only bring its claims in federal court after the agency has made a final

determination."[63] In other words, generally, a plaintiff must exhaust its administrative remedies

---

[62] 42 U.S.C. § 1395cc(h)(1)(A); *Smith v. Berryhill,* 587 U.S. 471, 475 (2019) ("Congress made clear that review would be available only 'as herein provided'—that is, only under the terms of § 405(g)."); *Weinberger v. Salfi,* 422 U.S. 749, 759 (1975) ("Even if the denial is nonfinal, it is still a 'decision of the Secretary' which, by virtue of the second sentence of [§] 405(h), may not be reviewed save pursuant to [§] 405(g).").

[63] *Nat'l Infusion Ctr. Ass'n v. Becerra,* 116 F.4th 488, 504-05 (5th Cir. 2024) (citing 42 U.S.C. §§ 405(g), (h); 1395ii and *Am. Hosp. Ass'n v. Azar,* 895 F.3d 822, 825-26 (D.C. Cir. 2018)). The *Am. Hosp. Ass'n* court explained how these statutes combine to create this requirement:

> Three statutes create the scheme for obtaining judicial review of Medicare claims. First, 42 U.S.C.
> § 405(h) divests the district courts of federal-question jurisdiction "on any claim arising under" Title
> II of the Social Security Act, and it bars any "decision of the Commissioner of Social Security" from

first before bringing an action in the federal courts. The Supreme Court has further interpreted the
"arising under the Medicare Act" concept to refer to claims or actions for which "the Medicare Act
provides both the standing and the substantive basis for the presentation of the claim."[64]
Moreover—and importantly for Defendants' Rule 12(b)(1) motion to dismiss Plaintiffs'
declaratory judgment requests in Count I of the Complaint—while the Fifth Circuit has interpreted
*the third sentence* of § 405(h), which explicitly divests federal courts of jurisdiction where federal
jurisdiction is based on either 28 U.S.C. §§ 1331 (federal question jurisdiction) or 1346 (federal
defendant jurisdiction), to *not* bar a bankruptcy court from exercising *bankruptcy jurisdiction*
under 28 U.S.C. § 1334,[65] it has nevertheless interpreted the *second sentence* in § 405(h) to
operate, effectively, as a separate jurisdictional bar *if the plaintiff is essentially challenging a
decision regarding its entitlement to benefits*.[66]

The case of *In re Benjamin* explains this focus on the "second sentence" versus the "third
sentence" of § 405(h). In *Benjamin*, the Fifth Circuit reversed and remanded a district court's
affirmance of a bankruptcy court's dismissal, under Rule 12(b)(1), for lack of subject matter
jurisdiction of claims brought by a chapter 7 individual as plaintiff in an adversary proceeding

---

being judicially reviewed, "except as herein provided" in other Title II provisions. Second, 42 U.S.C.
§ 405(g) provides for judicial review of Social Security Act claims, thus creating the exception
"herein provided." In pertinent part, it permits any person to file a civil action, "after any final
decision of the Commissioner of Social Security made after a hearing to which he was a party," to
"obtain a review of such decision" in federal district court. Third, 42 U.S.C. § 1395ii states that
certain provisions in § 405 and elsewhere in Title II "shall also apply with respect to" Title XVIII
of the Social Security Act—*i.e.*, the Medicare Act—"to the same extent as they are applicable with
respect to" Title II, with any reference to the "Commissioner of Social Security" considered as one
to the Secretary of HHS.

895 F.3d at 504 n.13 (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 7–9, (2000); *Heckler v. Ringer*,
466 U.S. 602, 614–15 (1984); *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1130–31 (D.C. Cir. 1992)).

[64] *Nat'l Infusion Ctr. Ass'n*, 116 F.4th at 505 (citing *Ill. Council*, 529 U.S. at 11).

[65] *In re Benjamin*, 932 F.3d 293, 296, 300 (5th Cir. 2019) ("[W]e interpret the third sentence [of § 405(h)] to mean
what it says. And it says nothing about § 1334. The district court erred by concluding that the third sentence barred
the bankruptcy court's § 1334 jurisdiction.").

[66] *In re Benjamin*, 932 F.3d 293, 301-02 (5th Cir. 2019).

against the Social Security Administration ("SSA"). The adversary proceeding there related to the
SSA's prepetition withholding of social security payments from the debtor to recoup alleged
prepetition overpayments. The debtor in *Benjamin* had alleged that the SSA had illegally collected
$6,000 from him, in violation of its own regulations.[67] The SSA moved under Rule 12(b)(1) to
dismiss the adversary proceeding, for lack of subject matter jurisdiction based on § 405(h)'s
channeling provisions, and also under Rule 12(b)(6), for failure to state a claim upon which relief
can be granted. The bankruptcy court granted the motion to dismiss simply "for the reasons stated
in the [m]otion" and the district court affirmed on jurisdictional grounds based on its interpretation
of ***the third sentence of § 405(h)*** as barring bankruptcy courts from relying on their bankruptcy
jurisdiction granted under 28 U.S.C. § 1334 to consider the debtor's claims.[68] The Fifth Circuit,
after noting that "[t]he Supreme Court has held that § 405(h) 'purports to make exclusive the
judicial review method set forth in § 405(g)' for claims falling within its scope[,]"[69] pointed out
that "[i]t does so by two means (though the means are listed in inverse order)[:] The third sentence
strips district courts of the most obvious sources of federal jurisdiction [i.e., 28 U.S.C. §§ 1331 or
1346] for any claims arising under Title II of the Social Security Act" while  the second sentence
"grants jurisdiction to district courts to review final agency decisions made after a hearing."[70] The
Fifth Circuit elaborated that the ***third sentence*** of § 405(h) does not mention bankruptcy subject
matter jurisdiction pursuant to 28 U.S.C. § 1334; thus, it was not a jurisdictional bar to the debtor,
Mr. Benjamin, bringing his adversary proceeding in the bankruptcy court. Nevertheless, if a
plaintiff's claim is "primarily about [ ] entitlement to benefits[,]" it would still be "channeled by §

---

[67] The debtor also demanded the return of the $536 withheld from him in the month he filed his bankruptcy petition.

[68] *Id.* at 295, 296.

[69] *Id.* at 296 (quoting *Ill. Council*, 529 U.S. at 10).

[70] *Id.*

405(h)'s *second sentence* into § 405(g)" (emphasis added), such that the bankruptcy court would

not be able to exercise its jurisdiction under § 1334 to hear the claim, unless and until the plaintiff

had exhausted his administrative remedies and obtained a final determination from the agency

after a hearing.[71] On the other hand, if a plaintiff "is *not* challenging a decision regarding his

entitlement to benefits made after application for payment and therefore *not* receiving the

statutorily-prescribed hearing under subsection [405](b)(1), his claim never gets channeled under

§ 405(h)'s second sentence or reviewed by a court under § 405(g)."[72]

C. <u>Relevant Bankruptcy Code Provisions</u>

Plaintiffs allege that Defendants' actions constituted a willful violation of the automatic

stay under Bankruptcy Code § 362 (Count II) in violation of (1) § 362(a)(1), prohibiting "the

commencement or continuation [of] . . . [an] action or proceeding against the debtor . . . to recover

a claim against the debtor that arose before the commencement of the case . . . ;" (2) § 362(a)(3),

prohibiting "any act to obtain possession of property of the estate or of property from the estate or

to exercise control over property of the estate;" (3) § 362(a)(6), prohibiting "any act to collect,

assess, or recover a claim against the debtor that arose before commencement of the case . . . ;"

and (4) § 362(a)(7), prohibiting "the setoff of any debtor owing to the debtor that arose before the

commencement of the case . . . against any claim against the debtor."[73]

---

[71] *Id.* at 302. The Fifth Circuit noted that "[t]his interpretation of § 405(h)'s second sentence is fully consistent with" their decision in *Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757 (5th Cir. 2011), where "[they] said that the second sentence applies when a 'judicial decision favorable to the plaintiff would affect the merits of whether the plaintiff is entitled to . . . benefits.'" *Benjamin*, 932 F.3d at 301 n.9 (quoting *Wolcott*, 635 F.3d at 764).

[72] *Id.* (emphasis added). The Fifth Circuit remanded the case to the bankruptcy court to determine if the debtor's claims were claims for entitlement to benefits that would be subject to the channeling provisions of § 405(h) and that would limit the bankruptcy court's jurisdiction to hear the claims, notwithstanding its ability to hear non-channeled claims pursuant to its general bankruptcy jurisdiction under the third sentence of § 405(h).

[73] 11 U.S.C. § 362(a)(1), (3), (6), and (7).

In addition, Plaintiffs seek a declaration that Defendants' actions are not excluded from the application of the automatic stay under § 362(b)(4)'s "police and regulatory power" exception, which excludes actions of a governmental unit "to enforce such governmental unit's or organization's police and regulatory power . . . ."[74] Courts in this District have stated that "[c]ase law makes clear that agencies qualify for the police and regulatory exception when they bring actions primarily intended to bring entities into compliance with applicable regulations[,]"[75] and have interpreted § 362(b)(4) broadly in holding that the exception "allows a 'governmental unit' to bring or continue actions against a debtor to prevent or stop violations of law affecting matters of public health, safety, *or welfare*."[76] And, as will be discussed in more detail below, the First Circuit, in a case with a strikingly similar fact pattern to that of this case, held that CMS's postpetition termination of the debtor-hospital's provider agreement ***because it had ceased providing inpatient services*** and, therefore, no longer qualified as a "hospital" under the Medicare statute did not violate the stay because it was "plainly an exercise of a regulatory power provided in the Medicare statute."[77]

Plaintiffs also allege that Defendants improperly discriminated against them in violation of Bankruptcy Code § 525(a), which provides, in pertinent part,[78] that:

> [a] governmental  unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, . . . a person that is or has been a debtor . . ., or another person with whom such . . . debtor has been associated, ***solely*** because such . . . debtor is or has been a debtor under this title . . . [or] has been insolvent before the commencement of the case under this title . . . .

---

[74] 11 U.S.C. § 362(b)(4).

[75] *See, e.g., In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 180 (Bankr. N.D. Tex. 2012).

[76] *Id.* (emphasis in original).

[77] *Parkview Adventist Med. Ctr. v. U.S. ex rel. Dep't of Health & Hum. Servs.*, 842 F.3d 757, 764 (1st Cir. 2016) (citing 42 U.S.C.§ 1395cc(b)(2)(B)), which provides that the Secretary may terminate a provider agreement when the provider "fails substantially to meet the applicable provisions of section 1395x of this title," which includes the statutory definition of "hospital").

[78] 11 U.S.C. § 525(a) (emphasis added).

The Fifth Circuit has stated that a violation under § 525(a) requires a showing that the governmental agency's "decision was made and that the filing of a bankruptcy was the ***sole reason*** for the decision."[79] The Supreme Court has also emphasized that an entity's status as a debtor in bankruptcy "***must alone be the proximate cause*** . . . [and] the act or event that triggers the agency's decision" in order to constitute conduct proscribed under § 525(a).[80]

## IV.   Legal Analysis

### A.   Rule 12(b)(1) Motion to Dismiss Count I Declaratory Judgment Action

As noted earlier, Defendants have moved to dismiss Plaintiffs' declaratory judgment action in Count I, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction, based on three separate theories: (1) Plaintiffs lack Article III constitutional standing, (2) Defendants, as agencies of the United States, are entitled to sovereign immunity and that sovereign immunity has not been waived by Congress, under Bankruptcy Code § 106(a) or otherwise, with respect to Plaintiffs' request in Count I for a declaration that the "Medicare Reimbursements" constitute property of the estates under Bankruptcy Code § 541, and (3) Plaintiffs have failed to exhaust administrative remedies under the Medicare Act.

In addition, Defendants argue that the court should exercise its discretion to dismiss the declaratory judgment count, even if it has subject matter jurisdiction over such claims, because the declaratory judgment claims are inherently duplicative of Counts II and III (damages for violating §§ 362(a) and 525(a), respectively).[81] Defendants include this argument in their discussion of their

---

[79] *Devon Enters., L.L.C. v. Arlington Indep. Sch. Dist.*, 541 F. App'x 439, 442 (5th Cir. 2013) (emphasis added).

[80] *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 301-02 (2003) (emphasis added).

[81] Motion, ¶ 19, at 11 (citing *In re Trevino*, 615 B.R. 108, 144 (Bankr. S.D. Tex. 2020) ("[D]ismissal of a declaratory judgment action is warranted where the declaratory relief plaintiff seeks is duplicative of other causes of action."); *8300 Buckeye Del. LLC v. UPS Supply Chain Sols., Inc.*, 2023 WL 7273712, at *13 (N.D. Tex. Sept. 17, 2023) ("Courts in the Fifth Circuit have declined to adjudicate declaratory judgment actions when the declaration seeks the same relief as other causes of action in the claim.").

motion to dismiss Count I under Rule 12(b)(1) for lack of subject matter jurisdiction. However, a discretionary dismissal of declaratory judgment claims that are duplicative of other claims would not be one based on lack of subject matter jurisdiction; it would, if anything, be a dismissal under Rule 12(b)(6) for failure to state a claim. Significantly, a dismissal under Rule 12(b)(1) is always mandatory, if the court lacks subject matter jurisdiction, and results in a dismissal without prejudice. But a dismissal under Rule 12(b)(6) will necessarily be a dismissal with prejudice if, indeed, a plaintiff has failed to state a claim for which relief can be granted. This is why a court must always address a Rule 12(b)(1) motion first and should only consider the merits of a Rule 12(b)(6) motion if it finds that it ***does*** have jurisdiction to hear the claim.[82]

### 1. Article III Constitutional Standing

When considering a declaratory judgment action, the court must first determine whether the action is justiciable, as the court must do in connection with all claims for relief. Plaintiffs bring their claims for declaratory relief in Count I under the federal Declaratory Judgment Act, which provides that "any court of the United States" is authorized to "declare the rights and other legal relations" of parties in "a case of actual controversy."[83] "That controversy must be of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts."[84] The Fifth Circuit "interprets the § 2201 'case or controversy' requirement to be coterminous with Article III's 'case or controversy' requirement."[85]

---

[82] *See supra* notes 42-45 and accompanying text.

[83] 28 U.S.C. § 2201; *see also Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 534 (5th Cir. 2012).

[84] *Id.* (cleaned up).

[85] *Id.* (quoting *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006)); *see also United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947) ("As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions are requisite. This is as true of declaratory judgments as any other field.") (cleaned up).

Under Article III of the Constitution, a federal court "may only adjudicate actual, ongoing controversies[,]"[86] and thus "[w]hether a case or controversy remains live throughout litigation is a jurisdictional matter."[87] "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."[88] It is well-established that a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the tripartite test for Article III standing: (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[89] "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[90]

Defendants argue, essentially, that Plaintiffs cannot meet the third element of the above tripartite test because Plaintiffs seek declaratory relief with respect to **past** acts, such that they cannot establish that they are likely to suffer a future injury that could be redressed by a favorable decision of the court regarding the declaratory relief requested.[91] A plaintiff seeking declaratory relief must demonstrate that they are "likely to suffer **future** injury,"[92] and that where "declaratory

---

[86] *Shemwell v. City of McKinney*, 63 F.4th 480, 483 (5th Cir. 2023) (citing *Honig v. Doe*, 484 U.S. 305, 317 (1988)).

[87] *Id.* (citations omitted).

[88] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

[89] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020) (citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022).

[90] *Transunion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up).

[91] *See Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) ("Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries.") (cleaned up).

[92] *Ingle v. Butler*, No. 2:24-CV-140-Z-BR, 2025 WL 1184657, at *7 (N.D. Tex. Apr. 1, 2025) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-03 (1983); *Serafine v. Crump*, 800 F. App'x 234, 236 (5th Cir. 2020) (per curium) (observing that "[a]lthough *Lyons* dealt with injunctive relief, [its] "reasoning applies equally to declaratory relief."")).

relief is premised on *past* acts, a plaintiff must establish 'either continuing harm or a real and immediate threat of repeated injury in the future.'"[93] The Fifth Circuit in *Stringer* explained that "[b]ecause injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury."[94]

Defendants point out that Plaintiffs concede here that CMS has already terminated CCMC's Medicare provider agreement as of June 21—three weeks before Plaintiffs filed their Complaint—and admit that Plaintiffs voluntarily placed a hold, effective June 3, on new claims for services furnished after May 1 at the Pennsylvania ASC/Imaging Sites and, further, that they fail to make any allegations that CMS failed to pay any submitted Medicare claims, so they cannot seek relief based on CMS's failure to accept and process claims that they have yet to submit. Plaintiffs respond that CMS is incorrect that they have not "pleaded facts showing a continuing harm or immediate threat of repeated harm[,]" arguing that their allegation in paragraph 38 of the Complaint that "CMS also indicated that it would view claims for services furnished since May 1, 2025 as potentially 'false or fraudulent,' notwithstanding that the [Debtors] had not submitted further claims since the parties' initial discussions" alleges a textbook continuing harm because the Debtors have refrained from submitting what they believe to be valid claims for Medicare reimbursements to avoid the prospect of severe fraud-based penalties if they were to submit such claims in the future. Defendants point out that Plaintiffs do not make any allegations that CMS has failed to pay any *submitted* Medicare claims, whether directly from CCMC for pre-closure services or indirectly for services rendered at the Pennsylvania ASC/Imaging Sites post-closure,

---

[93] *Id.* (quoting *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992)).
[94] *Stringer*, 942 F.3d at 720 (cleaned up).

and argue that Plaintiffs cannot seek declaratory relief to remedy CMS's alleged failure to "accept
and process" claims that they have yet to submit to CMS for review and processing.

The court concludes that Plaintiffs, in alleging that they have only failed to submit claims
they otherwise believe to be valid because of CMS's threats to view those claims as "false or
fraudulent," have sufficiently alleged a "threat of future injury" that satisfies the standing test under
*Stringer*. The Fifth Circuit, in *White Hat v. Murrill*, recently determined that similar allegations of
future injury were sufficient for standing purposes under *Stringer*, in holding that the district court
correctly determined that a certain group of plaintiffs (two individuals who had been arrested and
faced prosecution under a certain challenged statute) had Article III standing at the time they filed
suit, based on statements that the plaintiffs had curtailed their future activities due to the prospect
of being prosecuted under the allegedly unconstitutional law.[95] In *White Hat,* three groups of
plaintiffs had challenged the constitutionality of Louisiana's Infrastructure Trespass Statute[96] that
criminalized the "unauthorized entry of a critical infrastructure" as applied to the controversial
construction of a 162-mile pipeline that would connect an oil and gas hub in Texas with oil
refineries in Louisiana—controversial because the pipeline's path crossed through watersheds,
including the Atchafalaya Basin.[97] There were three groups of plaintiffs: two individuals who had
been arrested after refusing to leave a suspended structure that was attached to the in-progress
pipeline ("Arrested Plaintiffs"), certain landowners whose property the pipeline was traversing
("Landowner Plaintiffs"), and a group of organizations and individuals described as the "Advocacy
Plaintiffs." Defendants filed motions to dismiss for lack of standing as to all three groups of
plaintiffs. The district court found that the Advocacy Plaintiffs' allegations that they had organized

---

[95] *White Hat v. Murrill*, 141 F.4th 590, 603 (5th Cir. 2025) (quoting *Stringer*, 942 F.3d at 720).
[96] La. R.S. § 14.61.
[97] *Id.* at 597.

protests at other pipelines in the past and the Infrastructure Trespass Statute would have a chilling effect on their protest activities in the future, were insufficient for standing purposes, where plaintiffs acknowledged that their alleged injuries were only "traceable to, and redressable by a court order against" the Attorney General, who had been dismissed based on sovereign immunity. This left them with claims against the remaining defendants, which "sever[ed] the causation and traceability elements that the Advocacy Plaintiffs require[d] to have standing."[98] On the other hand, similar allegations of curtailment of future activities, due to fear of prosecution, that were made by the Arrested Plaintiffs were found by the district court to be sufficient to state an injury-in-fact that was traceable to the defendants, at the time of filing suit, based on distinct differences in the Arrested Plaintiffs' circumstances and allegations.[99] The Fifth Circuit upheld the district court's finding, stating[100]

> As the district court recognized, the Arrested Plaintiffs alleged two forms of injury: one based on present conditions at the time of filing—"the specter of prosecution for violating a potentially unconstitutional law," and one based on future conduct— enforcement of the Infrastructure Trespass Law would have "a chilling effect" on their "future protests of the Bayou Bridge Pipeline." And while the Defendants argue that the Arrested Plaintiffs "lack a sufficiently imminent injury and an injury that is traceable to Defendants," the Arrested Plaintiffs have alleged—as the district court noted—that ***"they desire to continue their protests over the Bayou Bridge Pipeline"*** but ***"have curtailed their activities because of their fear of prosecution under the amended"*** *Infrastructure Trespass Statute*.

Plaintiffs' allegations here—that they desire to submit Medicare claims to CMS for services rendered at the Pennsylvania ASC/Imaging Sites post-May 1, but they have refrained from doing so (or, in other words, their actions have been curtailed) because of the prospect of severe fraud-

---

[98] *Id.* at 601. The district court found that the Landowner Plaintiffs, who did not allege that they had participated in the protests or would participate in protests at the pipeline in the future, failed to state an injury-in-fact sufficient to defeat defendants' motion to dismiss for lack of standing.

[99] *Id.* at 603. The district court dismissed these same claims based on the fact that they had become moot during the course of the litigation, which the Fifth Circuit affirmed.

[100] *Id.* (emphasis added).

based penalties being assessed by CMS if they do so—similarly allege a future injury in satisfaction of *Stringer's* test for purposes of Article III standing. The court concludes that the Plaintiffs have constitutional standing to bring their claim for declaratory relief in Count I based specifically on Plaintiffs' allegations of future injury.

### 2. *Sovereign Immunity*

Defendants also argue that Plaintiffs' specific request in Count I for a declaration that the "Medicare Reimbursements" constitute property of the estates under Bankruptcy Code § 541 is barred by sovereign immunity and, therefore, should be dismissed under Rule 12(b)(1) based on lack of subject matter jurisdiction. As the Supreme Court recently reaffirmed, "[s]overeign immunity is jurisdictional in nature and deprives courts of the power to hear suits against the United States absent Congress's express consent."[101] That consent or waiver must be "unequivocally expressed in statutory text and will not be implied."[102] The Supreme Court, in *United States v. Miller*, cautioned that "waivers of sovereign immunity are to be read *narrowly*"[103] and that a court must "construe any ambiguities in the scope of a waiver in favor of the sovereign."[104] In a suit against the United States, "plaintiffs bear the burden of showing Congress's unequivocal waiver of sovereign immunity."[105]

Defendants acknowledge that, in Bankruptcy Code § 106(a), Congress has expressed an unequivocal waiver of sovereign immunity with respect to claims against the government arising

---

[101] *U.S. v. Miller*, 604 U.S. 518, 527 (2025) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).

[102] *Freeman v. U.S.*, 556 F.3d 326, 335 (5th Cir. 2009) ("Because [it] is jurisdictional in nature, Congress's waiver of it must be unequivocally expressed in statutory text and will not be implied.") (cleaned up); *see also U.S. v. Miller*, 604 U.S. at 532 (quoting *Fin. Oversight and Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023)) ("Under long-settled law, Congress must use unmistakable language to abrogate sovereign immunity.").

[103] *U.S. v. Miller*, 604 U.S. at 533 (quoting *Meyer*, 510 U.S. at 480).

[104] *Id.* at 532 (quoting *FAA v. Cooper*, 566 U.S. 284, 291 (2012)).

[105] *Freeman*, 556 F.3d at 334 (cleaned up).

under 59 enumerated provisions of the Bankruptcy Code. But, Defendants argue that because Bankruptcy Code § 541 is not among those enumerated provisions, Congress has not waived sovereign immunity regarding Plaintiffs' request in Count I for a declaration that the Medicare Reimbursements are property of the estate under § 541.[106] In other words, Defendants argue that this court does not have the jurisdiction, in this context now before it, to make a determination as to whether property is property of the estate under § 541. Plaintiffs counter that § 106(a) cannot possibly be read to divest a bankruptcy court of its broad authority under Bankruptcy Code § 105— which is expressly enumerated in § 106(a) as a provision subject to the waiver of sovereign immunity—to "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and its clear *in rem* authority under 28 U.S.C. § 1334(e)(1)[107] to determine what is and what is not property of the estate.

The court agrees with Plaintiffs. Here, the requested declaratory judgment concerning § 541[108] is entirely *in rem*, as it seeks a declaration and determination of what is and what is not property of Plaintiffs' bankruptcy estates. Count I does not seek to obtain a money judgment against CMS or a declaration, for that matter, of money owed by CMS. ***Thus, Count I does not encroach on the government's sovereign immunity.***[109] In addition, a finding that Plaintiffs' right

---

[106] Plaintiffs seek a declaration that "the Crozer Debtors' right to submit claims and receive Medicare Reimbursement is property of the estates under 11 U.S.C. § 541(a)."

[107] 28 U.S.C. § 1334(e)(1) provides, "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."

[108] Defendants do not claim that sovereign immunity has not been waived with respect to any of the other requests for declaratory relief in Count I or with respect to Plaintiffs claims under Count II for violation of the stay or Count III for violation of § 525, both of which provisions are among those expressly enumerated in § 106(a). Thus, this discussion is limited to the specific request for a declaration that the Debtors' right to submit claims to CMS for reimbursements, and the reimbursements themselves, constitute property of the estate under Bankruptcy Code § 541.

[109] *See Tenn. Student Asst. Corp. v. Hood*, 541 U.S. 440, 448 (2004) ("A bankruptcy court's *in rem* jurisdiction permits it to "determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is 'one against the world.' " (quoting 16 J. Moore, et al., Moore's Federal Practice § 108.70[1], at 108–106 (3d ed. 2004))); *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 378 (2006) ("In ratifying the Bankruptcy

to submit claims to CMS for reimbursement or the Medicare Reimbursements themselves are property of the estates under § 541 would be a necessary determination for finding a violation of the stay under § 362, a provision expressly enumerated under § 106(a), and § 106(b) expressly provides that "[t]he court may hear and determine any issue arising with respect to the application of such sections to governmental units." The court concludes that Congress has expressed in § 106 an unequivocal intent to abrogate sovereign immunity with respect to Plaintiffs' request for declaratory relief that their "right to submit claims and receive Medicare Reimbursements is property of the estates under 11 U.S.C. § 541(a)."

### 3. *Failure to Exhaust Administrative Remedies*

Defendants argue that this court does not have jurisdiction to hear any of Plaintiffs' requests in Count I for declaratory judgment because they are essentially claims that relate to Plaintiffs' entitlement to benefits under the Medicare Act, which claims are channeled under 42 U.S.C. Section 405(h) into the administrative review process, restricting judicial review of CMS's termination decision until Plaintiffs have exhausted their administrative remedies and obtained "a final decision of" the Secretary. Plaintiffs have the burden of establishing jurisdiction and, because this case is at the Rule 12(b)(1) stage, Plaintiffs "need only allege a plausible set of facts establishing jurisdiction."[110]

As noted earlier, § 405(h)'s channeling provisions (second sentence) create a bar to this court's exercise of its bankruptcy jurisdiction for claims falling within its scope until the plaintiff has exhausted its administrative remedies and obtained a final determination from the agency, at

---

Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts.").

[110] *In re Benjamin*, 932 F.3d 293, 295 (5th Cir. 2019).

which point jurisdiction would vest in the courts to review the agency's final determination.[111] If Plaintiffs' declaratory judgment claims are subject to the channeling provisions, then, under *Benjamin* and the second sentence of § 405(h),  the bankruptcy court would not be able to exercise its bankruptcy jurisdiction to hear those claims unless and until Plaintiffs have exhausted their administrative remedies. And, here, it is undisputed that Plaintiffs, while having commenced an administrative appeal of CMS's termination decision, have not received a "final determination" of the Secretary after a hearing as provided in § 405(g). To be clear, the Fifth Circuit interprets the second sentence of § 405(h) to channel into the administrative review process ***claims arising under the Medicare Act that are "primarily about entitlement to benefits."*** The court must look at each claim, on a claim-by-claim basis, to determine which claims are required to be channeled into the administrative review process under the second sentence of § 405(h), and which claims are not. The question before the court, then, is whether Plaintiffs' declaratory judgment claims in Count I are "primarily about entitlement to benefits" so as to be barred from judicial review until Plaintiffs have exhausted their administrative remedies.

Defendants argue that Plaintiffs' requests for declaratory relief are primarily about entitlement to benefits. Defendants point specifically to Plaintiffs':  (a) request for a declaration that CMS "may not terminate CCMC's Medicare enrollment or refuse to accept and process [claims for] Medicare Reimbursements after the Petition Date,"[112] and (b) acknowledgement that CCMC's enrollment and its ability to submit claims to CMS was terminated by CMS three weeks

---

[111] The third sentence of § 405(h), which expressly divests federal courts of their power to exercise federal question jurisdiction under 28 U.S.C. § 1331 and federal defendant jurisdiction under 28 U.S.C. § 1346 over claims brought against the government that arise under the Medicare Act, ***does not*** bar bankruptcy courts from exercising bankruptcy jurisdiction under § 1334 to hear claims against the government arising under the Medicare Act. But, as discussed earlier herein, the second sentence acts as a separate jurisdictional bar with respect to those claims that are channeled under the second sentence of § 405(h) into the administrative review process. *See supra* notes 63-66 and accompanying text.

[112] Motion, ¶ 21, at 11 (citing Complaint, ¶ 50).

before the Plaintiffs filed their Complaint. Defendants argue that this clearly constitutes a challenge to CMS's administrative decision to terminate CCMC's Medicare provider agreement and that this is "necessarily and primarily about 'entitlement to benefits' under the Medicare Act" and subject to the channeling provisions of § 405(h).[113] Thus, Defendants argue, this court does not at this time have jurisdiction over Plaintiffs' claims in Count I for declaratory relief, so Count I should be dismissed under Rule 12(b)(1).

Plaintiffs insist that they are not, through this Adversary Proceeding, challenging the Medicare statutory procedures and regulatory framework under which CMS made its "decision to terminate CCMC's Medicare enrollment and withholding of payments" and point out that Plaintiffs are, in fact, "pursuing such a challenge through an administrative appeal that is wholly separate from this adversary proceeding."[114] Plaintiffs say they are not disputing CMS's statutory authority to terminate Medicare provider agreements, but only seeking "a determination of whether there was a violation of the Bankruptcy Code."[115] At the Hearing, Plaintiffs' counsel clarified what it is, exactly, that the Plaintiffs are, and are not, seeking:[116]

> [W]e are not asking the Court today to wade into the intricacies of Medicare law, okay? You don't need to decide today, did CMS have the right to terminate? Was it a proper exercise of their powers here? Counsel's correct, that is the subject of a separate administrative action that is pending. There is an administrative appeal that will be heard by an ALJ, okay? Your Honor doesn't need to get there.
>
> ***CMS's authority to terminate is not at issue. What's at issue here and what this Court has jurisdiction to adjudicate is whether there's a violation of the Bankruptcy Code. That's all that's at issue today. The stay, automatic stay and 525.***

---

[113] Motion, ¶¶ 21-22, at 11-12.

[114] Response, ¶ 18, at 7.

[115] Response, ¶ 18, at 7-8.

[116] Hrg. Transcript, 26:24-27:11 (emphasis added).

But, Defendants have not challenged this court's subject matter jurisdiction with respect to Plaintiffs' causes of action arising under Bankruptcy Code § 362, for violation of the automatic stay (Count II), and under Bankruptcy Code § 525(a), for prohibited discrimination against a debtor by a governmental entity (Count III); Defendants have not argued that those causes of action are claims primarily about entitlement to benefits that are subject to the channeling provisions of § 405(h) such that this court does not have jurisdiction to hear them until Plaintiffs have exhausted their administrative remedies.[117] It seems that Plaintiffs' insistence that they are only seeking to have this court consider whether CMS's actions violated the stay, or were prohibited under the anti-discrimination provisions of § 525(a)—claims Plaintiffs affirmatively assert in Counts II and III—can only mean one of two things:  (1) that their claims for declaratory relief in Count I are merely duplicative of their claims under Bankruptcy Code §§ 362 and 525(a) (over which

---

[117] The cases that Plaintiffs point to in support of their position that because, the actions were brought under §§ 362 and 525, "[i]t is irrelevant whether such termination technically complied with the Medicare Act's regulatory framework," are simply not applicable to the question before the court regarding Plaintiffs' separate request for declaratory relief under the federal Declaratory Judgment Act. *See* Response, ¶¶ 16-17, at 6-7 (citing *AHN Homecare, LLC v. Home Health Reimbursement and Health Care Financing Admin. (In re AHN Homecare, LLC)*, 222 B.R. 804, 811 (N.D. Tex. 1998) ("With respect to the cause of action based on the violation of the automatic stay, because it 'arises under' the Bankruptcy Code and not the Medicare Act, this court has jurisdiction"); *True Health Diagnostics LLC v. Azar (In re THG Holdings LLC)*, 604 B.R. 154, 162 (Bankr. D. Del. 2019) (finding jurisdiction where "the issue before the Court is the narrow question of whether the Defendants are in violation of the automatic stay by continuing to withhold Medicare payments post-petition . . . based upon alleged pre-petition overpayments."); *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1072 (3d Cir. 1992) (for the proposition that "the Bankruptcy Code supplies an independent basis for jurisdiction" to enforce the automatic stay against CMS with respect to the withholding of postpetition payments.)). In addition, as Defendants point out, unlike the facts in *THG* and *UMC*, **Plaintiffs have not alleged, nor could they, that CMS, here, is withholding any approved postpetition Medicare payments owed to the Plaintiffs**. In fact, CMS has paid **all** claims submitted by CCMC in the ordinary course, including claims submitted after May 2, 2025. Reply, ¶ 9, at 5-6 (citing to Complaint, ¶ 41, where Plaintiffs admit that the claims for reimbursement for services rendered by the Pennsylvania ASC/Imaging Sites post-closure of CCMC "have not yet been processed and paid" since Plaintiffs' "voluntary hold on such claims went into effect," with no allegation in the Complaint that any amounts are currently being withheld by CMS). Moreover, Debtors' citation to *UMC* for the proposition that "administrative exhaustion does not apply given that the bankruptcy court has independent jurisdiction to adjudicate alleged violations of the Bankruptcy Code[,]" is equally unavailing and inapposite because the *UMC* court found that it had jurisdiction because "there [wa]s no system of administrative review in place to address the issues raised by *UMC* in its adversary proceeding[]" whereas, here, whether the Pennslvania ASC/Imaging Sites qualified as HOPDs once the main provider (CCMC) closed, is not only an issue that must first be decided by CMS, but Plaintiffs are simultaneously pursuing their requested relief through the established administrative process, and, thus, Plaintiffs here, **unlike** UMC, have an alternative path for relief available to them. *See UMC*, 973 F.2d at 1073.

Defendants have not challenged this court's exercise of subject matter jurisdiction) or (2) that their declaratory judgment claims in Count I ask for something *more*—some form of relief that *does* relate to their entitlement to Medicare benefits. If the former, then this court has the discretion to dismiss Count I under Rule 12(b)(6). If the latter, this court lacks subject matter jurisdiction and Count I should be dismissed under Rule 12(b)(1).

The court ultimately agrees with Defendants, that Plaintiffs' requests for declaratory relief, as stated in their Complaint, present it with the *latter* situation: Plaintiffs' requests for relief in Count I, distilled to their essence, ***primarily relate to entitlement to Medicare benefits such that this court does not have subject matter jurisdiction to hear those claims unless and until Plaintiffs have exhausted their administrative remedies and obtained a final determination from CMS with respect to CMS's termination of CCMC's enrollment***. The statutory and regulatory provisions governing the termination of CCMC's Medicare provider agreement relate to entitlement to Medicare participation (and, therefore, entitlement to Medicare payments); without a provider agreement, CCMC does not have Medicare billing privileges and therefore cannot submit claims to CMS for reimbursement.[118] Under *Benjamin*, Plaintiffs' request for "a declaration that Defendants may not terminate CCMC's Medicare enrollment or refuse to accept and process Medicare Reimbursement after the Petition Date" is "unquestionably administrative in nature" and a "claim for administrative entitlement."[119] Because Plaintiffs, admittedly, have failed to exhaust their administrative remedies regarding CMS's initial termination decision, this court has no

---

[118] *See* 42 U.S.C. § 1395cc(a)(1); 42 C.F.R. § 424.505.

[119] *Affiliated Pro. Home Health Care Agency v. Shalala,* 164 F.3d 282, 285-86 (5th Cir. 1999); *see Timberlawn Mental Health Sys. v. Burwell*, 2015 WL 4868842, at *3-4 (N.D. Tex. 2015) (denying a hospital-plaintiff's motion for temporary restraining order to prohibit HHS from terminating its Medicare provider agreement because the plaintiff's request to "continue its participation in the Medicare program pending an administrative appeal of CMS' termination decision" falls squarely into the types of issues barred under section 405(h)); *Dallas Healthcare, Inc. v. Health and Hum. Servs. Comm'n,* 921 F. Supp. 426, 429 (N.D. Tex. 1996) ("[T]he issue of whether TDHS applied the proper standard [in terminating a provider agreement] goes directly to Dallas Healthcare's claim of entitlement and is not separate or collateral to the issue being considered on appeal by the Secretary.").

jurisdiction to hear Plaintiffs' declaratory judgment claims asserted in Count I. Accordingly, Count I should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Because the court has no jurisdiction to consider these claims, it will not address Defendants' Rule 12(b)(6) arguments as to Count I, including Defendants' "duplicative claim" argument mentioned above.

To the extent that Plaintiffs' request, in their prayer for relief, to ***enjoin*** CMS from terminating or refusing to process any claims submitted to CMS in the future, under CCMC's already terminated provider agreement, prior to the exhaustion of Plaintiffs' administrative appeal ***is tied to Counts II or III*** (where Defendants have not moved under Rule 12(b)(1), or specifically challenged this court's subject matter jurisdiction with respect to CMS's alleged violations of Bankruptcy Code §§ 362 and 525), the court exercises its independent duty to examine whether it has jurisdiction to grant such an injunction.[120] The court finds that it does not have subject matter jurisdiction to issue the requested injunctive relief, for the same reason it lacks the power to issue the declaratory relief in Count I: Plaintiffs have failed to exhaust their administrative remedies.

The court will now address Defendants' Rule 12(b)(6) motion to dismiss Counts II and III (***seeking monetary damages*** for CMS's alleged violations of Bankruptcy Code §§ 362 and 525(a), respectively).

B. Rule 12(b)(6) Motion to Dismiss Count II – Violation of the Automatic Stay Under Bankruptcy Code § 362

Defendants argue that Plaintiffs' claims in Count II for violation of the automatic stay under Bankruptcy Code § 362(a) should be dismissed under Rule 12(b)(6) because, after taking all well-

---

[120] *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.") (cleaned up); *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022) ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.") (cleaned up).

pled facts as true and making all reasonable inferences in favor of the Plaintiffs, Plaintiffs have not stated a plausible claim that CMS's actions: (a) violated the automatic stay provisions under § 362(a), in the first instance, or (b) that CMS's actions were not exempt from the application of the stay under the "police and regulatory powers" exception set forth in § 362(b)(4). Defendants also argue that Plaintiffs seek damages in Count II of their Complaint only and specifically under Bankruptcy Code § 362(k), and that § 362(k) only permits *individual* debtors (and not corporate entities) to recover damages for a willful violation of the stay.

Plaintiffs cite two actions of the Defendants as violations of the automatic stay: (1) "Defendants' termination of CCMC's Medicare enrollment and associated threats of monetary penalties[,]"[121] and (2) "Defendants have . . . made express post-petition demands for payment of pre-petition CMS Obligations[.]"[122]

The first alleged stay violation—termination of the CCMC Medicare enrollment and alleged threats to assess penalties if Debtors billed for services after the CCMC hospital closure— is an easier analysis. Defendants argue that because CMS's termination of CCMC's Medicare enrollment was *based solely on CCMC's closure of its hospital providing inpatient services*, it was a quintessential exercise of its police and regulatory powers, citing *In re FiberTower Network Servs. Corp.*[123] Defendants argue that the *FiberTower* court "interpreted § 362(b)(4) extremely broadly," in holding that this exception "allows a 'governmental unit' to bring or continue actions against a debtor to prevent or stop violations of law affecting matters of public health, safety, *or welfare*."[124] Further, CMS bears regulatory responsibility for "effective[ly] managing the public

---

[121] Complaint, ¶ 53.

[122] Complaint, ¶ 54.

[123] 482 B.R. 169, 180 n.4 (Bankr. N.D. Tex. 2012) ("Case law makes clear that agencies qualify for the police and regulatory exception when they bring actions primarily intended to bring entities into compliance with applicable regulations[.]").

[124] *Id.* (quoting *In re Nortel Networks, Inc.*, 669 F.3d 128, 130 (3d Cir. 2011)) (emphasis in original).

funds entrusted to the Medicare program" and "has a critical interest in maintaining the integrity of the Medicare program."[125] CMS elaborates:

> Because CCMC is no longer a "hospital," the Debtors' receipt of payments from billing the Pennsylvania ASC/Imaging Sites as hospital-based outpatient departments pursuant to CCMC's terminated Medicare provider number compromises the integrity and management of the public funds administered by CMS. CMS thus acted well within its "generally applicable regulatory laws" to ensure that Medicare funds meant for hospitals which primarily service inpatients were not billed for by facilities which solely service outpatients.[126]

Defendants further argue that conditions for participating in the Medicare program are "specifically intended to protect public health and safety and plainly further a vital public interest,"[127] and that Plaintiffs admit that they unilaterally "decided to continue services at the Pennsylvania ACS/Imaging Sites" as hospital outpatient departments, without certifying that these sites met the regulatory conditions to qualify as hospital-based facilities—a matter that is to be decided by CMS, not the facility.[128] Defendants conclude that "[w]here, as here, CMS' regulatory actions intended to bring CCMC into compliance with federal healthcare law, CMS' termination falls squarely within the agency's police and regulatory powers. No more obvious exercise of the government's power to 'protect the health, safety, and welfare of the public' can be imagined than CMS's administrative decision here."[129]

---

[125] Motion, ¶ 32, at 25 (citing *In re Tri Cnty. Home Health Servs., Inc.*, 230 B.R. 106, 113 (Bankr. W.D. Tenn. 1999)).

[126] Motion, ¶ 32, at 19.

[127] Motion, ¶ 33, at 19 (citing 42 U.S.C. § 482.1).

[128] A "provider-based entity" means a provider of health care services . . . that is either created by, or acquired by, a main provider for the purpose of furnishing health care services of a different type from those of the main provider under the ownership and administrative and financial control of the main provider [and] all final determinations as to whether particular facilities or organizations are provider-based are to be made by [CMS]." 42 C.F.R. § 413.65(a)(2). Plaintiffs, here, submitted a request to CMS to determine that the Pennsylvania ASC/Imaging Sites be deemed provider-based entities on July 7, 2025, over two months ***after*** closing CMCC.

[129] Motion, ¶ 34, at 20 (quoting *FiberTower*, 482 B.R. at 180). Defendants also point to a First Circuit case in support of their position. *See* Motion, ¶ 31, at 19 (citing *Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757, 764 (1st Cir. 2016) (where the court held that CMS's termination of a hospital's Medicare provider agreement did not violate the automatic stay because it was an exercise of regulatory power under the Medicare statute)).

Plaintiffs do not address the Fifth Circuit's *FiberTower* case or *Parkview Adventist*, the latter of which was a case in which the First Circuit held that CMS's termination of a hospital's Medicare provider agreement did not violate the automatic stay because it was an exercise of regulatory power under the Medicare statute.[130] Instead, Plaintiffs point to a Third Circuit case, *Nortel Networks*,[131] that identifies the two tests that courts apply, at least in the Third Circuit, when evaluating whether a government's actions qualify for the police and regulatory power exception of § 362(b)(4)—(i) the ***pecuniary purpose*** test and (ii) the ***public policy*** test[132]—and argue that Defendants cannot meet either test.[133] Quoting the Third Circuit's *Nortel Networks* case, the Fifth Circuit has described the two tests as follows:[134]

> "The pecuniary purpose test asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health." "The public policy test asks whether the government is effectuating public policy rather than adjudicating private rights." Thus, "[i]f the purpose of the law is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay applies. If, on the other hand, the purpose of the law is to protect the government's pecuniary interest in the debtor's property or ***primarily*** to adjudicate private rights, then the exception is inapplicable."

The Fifth Circuit clarified that the public policy test is met if "the particular proceeding at issue is designed ***primarily*** to protect the public safety and welfare[,]" and, thus, the focus, in looking at both tests, is on which interests the governmental agency is ***primarily*** trying to protect.[135]

---

[130] *Id.*

[131] *In re Nortel Networks, Inc.*, 669 F.3d 128 (3d Cir. 2011).

[132] The Fifth Circuit has specifically adopted these two "related, and somewhat overlapping" tests that have been applied by *Nortel Networks* and other courts in making the determination of "whether proceedings fall within the police or regulatory power exception to the automatic stay[.]" *Halo Wireless, Inc. v. Alenco Commc'ns, Inc. (In re Halo Wireless, Inc.)*, 684 F.3d 581, 588 (5th Cir. 2012) (quoting *Nortel Networks*, 669 F.3d at 139) (quoting *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1108 (9th Cir. 2005))) (other citations omitted).

[133] Response, ¶ 31, at 9 (citing *In re Nortel Networks, Inc.*, 669 F.3d 128, 140 (3d Cir. 2011)).

[134] *Halo Wireless*, 684 F.3d at 588 (quoting *Nortel*, 669 F.3d at 139-40) (emphasis added); *see also In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*, 626 B.R. 278, 284-85 (Bankr. S.D. Tex. 2021)

[135] *Id.* (cleaned up).

Plaintiffs argue that CMS only terminated CCMC's Medicare enrollment after CMS had been unsuccessful at obtaining an agreement from the Debtors regarding payment of some or all of the Debtors' approximately $8 million in CMS Prepetition Obligations and, thus, CMS was acting in its pecuniary interest when it issued the termination and, further, that "Defendants' bare contention that they are seeking to serve the public interest, rather than their own pecuniary motives, should not be credited" at the Rule 12(b)(6) stage.[136] Plaintiffs cite several cases in support of their position that CMS's exercise of its regulatory power to notify CCMC of its ineligibility to participate in the Medicare program is not excepted from the automatic stay under § 362(b)(4).[137] But these cases are inapposite and distinguishable from the two Fifth Circuit cases, *FiberTower* and *Halo Wireless,* for one main reason: they do not apply the test in the Fifth Circuit— which is to ask, not whether the governmental entity clearly has a pecuniary interest that it is protecting ***in addition to*** having a public policy interest, but ***which*** interest the governmental entity's actions seemed aimed to ***primarily*** protect. Based on the facts alleged in this Complaint, Plaintiffs, here, cannot state a plausible claim that CMS's actions were designed to protect a pecuniary interest at all—much less a pecuniary interest being CMS's ***primary*** concern.

While, at first blush, it may appear that Plaintiffs might have at least pled a plausible claim that CMS's actions might have been primarily aimed at a pecuniary interest—i.e., aimed at

---

[136] Response, ¶ 33, at 14.

[137] *See* Response, ¶¶ 31-32, at 13-14 (in addition to *Nortel Networks*, citing *In re North*, 128 B.R. 592, 602 (Bankr. D. Vt. 1991) (for the proposition that "where it is obvious the plain purpose" of a governmental unit's action is "to serve a pecuniary interest," courts require proof beyond just a "governmental unit's unsupported explanation that its actions serve public safety, health, and welfare); *True Health Diagnostics LLC v. Azar (In re THG Holdings LLC)*, 604 B.R. 154, 158 (Bankr. D. Del. 2019) (CMS's withholding of postpetition Medicare payments due on account of alleged fraud allegations was the "exact conduct that the pecuniary interest [test] was designed to prohibit"—namely, withholding postpetition payments on account of prepetition overpayments); *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 927 (Bankr. N.D. Cal. 1994) (where the court found that CMS's purported justification for suspending postpetition payments, alleged fraud, would qualify as an exception to the automatic stay if substantiated, but, "inasmuch as the suspension is an attempt to enforce a monetary claim, it exceeds the scope of the police power exception.")).

collecting its CMS Prepetition Obligations that were north of $8 million, such that Count II should survive the Motion to Dismiss, to be further fleshed through in discovery—there is one flaw in such a premise that makes this not plausible. It revolves around what is a fairly routine "first day" motion that we see in complex Chapter 11 cases that the Debtors filed on January 13, 2025:  a motion authorizing the Debtors to maintain and administer prepetition refund programs and pay and honor related prepetition obligations ("Motion to Honor Certain Prepetition Obligations").[138]

A motion such as the Motion to Honor Certain Prepetition Obligations can come in a variety of shapes and sizes in any given Chapter 11 case. But the one here had the following language:

> In the ordinary course of business, the Debtors operate pursuant to numerous contracts and agreements, as well as various state and federal laws and administrative rules (such laws and rules, collectively, the "Regulations"), which in certain instances require the Debtors to issue refunds, reimbursements, or payments, as applicable, to patients and third-party payors, including healthcare insurers, managed care organizations, plan vendors, commercial payors, private pay sources, Medicare, Medicaid, medical service plan and claims administrators, and other governmental and quasi-governmental agencies (collectively, the "Refund Recipients"). The Debtors may owe refunds to Refund Recipients as a result of an overpayment by such parties, as well as pursuant to the terms of the Debtors' contracts with Health Plans or Physician Affiliates (both, as defined below). The Debtors routinely process refunds, or are subject to offsets or recoupments for reimbursement of overpayments or payments made by or on behalf of patients, resulting from the interaction between the Debtors' billing procedures, patient medical insurance deductibles, and third-party payments, including payments made in connection with extended repayment plans with the applicable federal or state agencies overseeing Medicare and Medicaid (the "Refund Programs"). As described further herein, the Debtors may owe refunds to Refund Recipients as a result of overpayment by such parties [a chart was included estimating that Debtors might owe CMS $42 million].[139]

The motion went on to have a subsection entitled "Medicare Advances."  It stated:

> In the aftermath of the COVID-19 pandemic, as well as a cyber-attack on its computer systems, the Debtors experienced significant financial difficulties. As

---

[138] DE # 10, filed January 13, 2025.

[139] *Id.* at ¶ 8.

such, the Debtors were eligible and received relief from the Coronavirus Aid, Relief and Economic Security Act, the Paycheck Protection Program and Health Care Enhancement Act (the "PPPHCE Act"), the Continuing Appropriations Act, 2021 and Other Extensions Act, and the Consolidated Appropriations Act, 2021 (collectively, (the "COVID Acts"). The COVID Acts also revised the Medicare accelerated payment program in an attempt to disburse payments to hospitals and other care providers more quickly.

The Debtors received advance payments from the Medicare accelerated payment program beginning in 2020 related to the COVID-19 pandemic (the "COVID-19 Medicare Advances"). The Debtors estimate that approximately $30.6 million in COVID-19 Related Medicare Advances remain outstanding as of the Petition Date.[140]

The Motion to Honor Certain Prepetition Obligations went on to state that the Debtors received accelerated payments pursuant to the Medicare accelerated payment program (the "Cyber Attack Medicare Advances" and, together with the COVID-19 Medicare Advances, the "Advances"). The Debtors estimated that approximately $11.4 million in Cyber Attack Related Medicare Advances remain outstanding as of the Petition Date.

This court approved the Motion to Honor Certain Prepetition Obligations on a final basis on February 12, 2025.[141]  In summary, this court expressly authorized the Debtors, in the early days of case, to "pay and honor related prepetition obligations under the Refund Programs" which happened to include the CMS Prepetition Obligations—based on the Debtors' acknowledgement that they were "subject to offsets or recoupments for reimbursement of overpayments or payments made . . . including payments made in connection with extended repayment plans with the applicable federal or state agencies overseeing Medicare and Medicaid."[142] Therefore, Plaintiffs' argument that CMS's actions here violated the stay seems implausible.

---

[140] Id. at 20-21.

[141] DE # 604, *Final Order (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Refund Programs, and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, entered on February 12, 2025.
[142] DE # 10, ¶ 8, filed January 13, 2025.

Just to be clear, Plaintiffs have made the following statements in their Complaint to suggest that pecuniary interests were being pursued by CMS, such that § 362(b)(4) did not protect them and that outright violations of the stay, pursuant to §§ 362(a)(1), (3), (6) and (7) occurred:

> "Shockingly, it has become apparent that CMS is attempting to leverage play and is unfairly penalizing Prospect with regard to this issue because of prepetition amounts that CMS believes it is due."[143]

> "CMS's insinuation that settlement discussions could only continue if the Crozer Debtors were able to pay these prepetition amounts, and that CCMC's Medicare enrollment would be terminated if the Crozer Debtors are unable to pay these prepetition debts . . . [and] CMS's attempts to garnish amounts due to the Crozer Debtors postpetition on account of prepetition debts are also violations of the automatic stay."[144]

> "CMS indicated that ultimately, CMS's decision was largely financial, as CMS recognized that it may not able to recover the prepetition debts for the CMS Obligations, and CMS was unwilling to continue to pay for services at CCMC as a result."[145]

> "Counsel to CMS told the Crozer Debtors that the only possibility of potentially persuading CMS to consider re-visiting their decision would be if CCMC entered into a settlement that allows CMS to recover some or all of that prepetition amount. CMS also has separately pursued recovery of the prepetition CMS Obligations, including by sending letters to the Crozer Debtors demanding such payments."[146]

Without a doubt, in some situations, this would be enough to survive a Rule 12(b)(6) motion—creating at least a plausible claim for a stay violation. But here, Debtors contemplated early in the case that they would honor offset or recoupment rights of CMS. Thus, even if CMS had some overlapping pecuniary interest with regard to its Termination Notice and not paying for outpatient services post-closure of CCMC, and even if CMS communicated some desire to recover the CMS Prepetition Obligations postpetition, the undisputed reality is that the Debtors set the

---

[143] Complaint, ¶ 5.

[144] Id.

[145] Complaint, ¶ 39.

[146] Complaint, ¶ 40.

stage early on for CMS to perhaps use the CMS Prepetition Obligations as a bargaining chip for later reimbursements owed (with the Motion to Pay Certain Prepetition Obligations). Even if all allegations set forth above are taken as true, Plaintiffs still do not plausibly state a claim for relief here. CCMC had publicly admitted, on its own website and in court filings, that it was reluctantly closing its doors and would no longer operate as a hospital and represented that they themselves would terminate CCMC's enrollment once it closed its emergency department. In the Termination Notice itself, CMS neither demanded payment from the Debtors nor sought to recover property from the Debtors' estates. There is no allegation that CMS has actually sought fines or penalties. Finally, the court reiterates, that where, as here, this court expressly authorized the Debtors, in the early days of case, to "pay and honor related prepetition obligations under the Refund Programs" which included the CMS Obligations,[147] and the Debtors had acknowledged that they are "subject to offsets or recoupments for reimbursement of overpayments or payments made . . . including payments made in connection with extended repayment plans with the applicable federal or state agencies overseeing Medicare and Medicaid,"[148] Plaintiffs' argument that CMS's actions violated the stay is untenable.

Therefore, Count II should be dismissed under Rule 12(b)(6) for failure to state a claim.

C. Rule 12(b)(6) Motion to Dismiss Count III – Violation of Bankruptcy Code § 525(a)

Defendants also seek to dismiss, under Rule 12(b)(6), Count III, in which Plaintiffs seek damages for CMS's alleged violation of the anti-discrimination provisions of Bankruptcy Code § 525(a). Defendants argue that Plaintiffs' allegations that CMS's "termination of CCMC's Medicare enrollment and threats of monetary penalties" constituted "discriminatory acts taken

---

[147] Motion, ¶ 35, fn. 6, at 20 (citing to DE # 604, *Final Order (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Refund Programs, and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, entered on February 12, 2025).
[148] Motion, ¶ 35, fn. 6, at 20 (citing DE # 10, ¶ 8, filed January 13, 2025).

solely because the [Plaintiffs] are debtors under title 11," in violation of § 525, fails to plead sufficient facts to state a plausible claim for relief. CMS argues that any potential damages to Plaintiffs would necessarily arise from Plaintiffs' alleged claims for reimbursement related to services provided by the Pennsylvania ASC/Imaging Sites after CMCC closed—that Plaintiffs admittedly have not submitted to CMS; that these yet-to-be submitted claims and any potential amounts due are solely within the exclusive jurisdiction of the Secretary of HHS to adjudicate; and that the court must dismiss Count III because the undisputed facts cannot support Plaintiffs' allegations that CMS terminated CCMC's Medicare provider agreement '*solely because*' of CCMC's bankruptcy filing, which is a required showing under § 525(a).

The court agrees with Defendants. Plaintiffs do not disagree with the notion that, under Bankruptcy Code § 525(a), a plaintiff must show that *the fact that a debtor is a debtor in bankruptcy or was insolvent prior to the petition date must be the sole and only cause for a governmental entity's actions*.[149]    Defendants point to the *Parkview Adventist* case as being particularly instructive here.[150] In that case, which involved substantially similar facts to CMS's termination here of CCMC's provider agreement, in addition to holding that CMS's postpetition termination of the debtor-hospital's Medicare provider agreement was exempt from the automatic stay under Bankruptcy Code § 362(b)(4)'s "police and regulatory power" exception, the court held that CMS's termination of the hospital's provider agreement did not violate § 525(a) because there was "nothing in the termination decision that depended upon [the debtor's] insolvency or

---

[149] *See Devon Enters., L.L.C. v. Arlington Indep. Sch. Dist.*, 541 F. App'x 439, 442 (5th Cir. 2013) (a violation under § 525(a) requires a showing that the government's "decision was made and that the filing of a bankruptcy was the *sole reason* for the decision.") (emphasis added); *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 301-02 (2003) ("Section 525 means nothing more or less" than that an entity's status as a debtor in bankruptcy "*must alone be the proximate cause* . . . [and] the act or event that triggers the agency's decision" in order to constitute proscribed conduct.) (emphasis added).

[150] Motion, ¶ 41, at 24 (citing *Parkview Adventist*, 842 F.3d 757).

bankruptcy petition."[151] As noted above in connection with this court's discussion of § 362(b)(4), Debtors acknowledge that the reason for CMS's termination of CCMC's provider agreement was because CMS had made the determination that CCMC was not in compliance with the applicable Medicare statutory and regulatory provisions—CCMC had closed its Medicare-provider hospital to in-patient services. Moreover, it is significant that CMS did not terminate CCMC's provider agreement during the first five months of the bankruptcy case and had, in fact, processed claims under the CCMC provider agreement for postpetition services rendered *by the debtor* during those five months prior to CCMC's closure. In sum, there are no facts or allegations that can support the notion that CMS terminated CCMC's provider agreement "solely because" of its bankruptcy filing, and, thus, Plaintiffs have failed to state a plausible claim for relief under Bankruptcy Code § 525(a). Count III should be dismissed under Rule 12(b)(6) for failure to state a claim.

## V.     CONCLUSIONS

For the reasons set forth above, the court concludes that Plaintiffs' claims for declaratory relief in Count I, as well as Plaintiffs' requests in their prayer for relief for injunctive relief should be dismissed, without prejudice, pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, based on the failure of Plaintiffs to exhaust their administrative remedies. As to Counts II and III, they should be dismissed, with prejudice, under Rule 12(b)(6), for failure to state a claim for which relief can be granted. Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss as to Count I and as to Plaintiffs' requests for injunctive relief be, and hereby is, **GRANTED,** pursuant to Rule 12(b)(1), for lack of

---

[151] *Parkview Adventist*, 842 F.3d at 765 (where CMS had issued a termination letter to the debtor just three days into the bankruptcy case, stating it was terminating the debtor's provider agreement because the debtor "had decided to close its inpatient facilities and thereby had ceased to qualify as a hospital under the Medicare statute").

subject matter jurisdiction, and that Count I and Plaintiffs' requests for injunctive relief are hereby *dismissed, without prejudice*;

**IT IS FURTHER ORDERED** that Defendants Motion to Dismiss as to Counts II and III be, and hereby is, **GRANTED,** pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted, and that Counts II and III are hereby *dismissed, with prejudice*.

#### #### END OF MEMORANDUM OPINION AND ORDER ####